FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

SEP 21 2026

KEVIN P. WEIMER, Clerk
By: [signature] Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| SELLATHURAI ("GANESH") SRIGANESHA and SANGEETHA SRIGANESHA,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF MILTON, GEORGIA; and JASON GRIFFIN, in his individual capacity,<br><br>Defendants. | Civil Action No. 1:26-cv-04820-SEG<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

Plaintiffs Sellathurai ("Ganesh") Sriganesha and Sangeetha Sriganesha, appearing pro se, file this First Amended Complaint as a matter of course under Federal Rule of Civil Procedure 15(a)(1)(B), within twenty-one days after service of Defendants' motion under Rule 12(b) [Doc. 5], and allege as follows.

## I. NATURE OF THE ACTION

1. Two households on Eagles Pass in Milton, Georgia sought help from the same police department concerning the same events. One household is white. The other is a South Asian family of Sri Lankan origin. This case is about the difference in what they received.

2. The contrast began with the Milton Police Department's ("MPD") first involvement. Plaintiffs' then-neighbor, Paula Fisher, had no permission from Plaintiffs to cut or remove any trees along the property line, and Plaintiffs had no notice before March 15, 2023 that any cutting was planned. Fisher raised the trees with MPD instead, telling Officer Zachary O'Neill that Plaintiffs were "Indians on a work visa" with a "heavy accent" and describing her plan to cut the trees, as MPD's own Internal Affairs record reflects. MPD authorized a civil standby for the tree work; no one from MPD contacted Plaintiffs before it. Plaintiffs first learned of the planned cutting on March 15, 2023, when a man accompanying Fisher knocked on their door and told them to move their car out of their own driveway. Over the next six hours, Fisher, Dennis Guaracino, and an Emergency Tree USA crew cut or damaged trees that Plaintiffs' survey placed on Plaintiffs' property, damaged Mr. Sriganesha's truck, and destroyed the children's basketball backstop. Plaintiffs called 911 while the cutting continued. On body-worn-camera footage, Officer O'Neill described Plaintiffs as calm while attempting to calm Fisher; Sergeant Chad West nevertheless told Plaintiffs, in substance, that if the situation became criminal, someone was probably going to end up in jail. Five months later, when Fisher accused Mr. Sriganesha of recording her, MPD arrested him—even though the device was a non-functioning cellphone resting inside Plaintiffs' home on a window and was not recording, as Officer Sarah Moore-Whittington recorded

in her report, and Mr. Sriganesha was not holding it. Eleven days later, Mrs. Sriganesha reported to the same officer that Fisher was holding a cellphone and pointing it toward Plaintiffs' minor children while they were in Plaintiffs' driveway. Plaintiffs identified witnesses and provided security-camera footage. The report was closed "Unfounded" the next day.

3. Defendant Jason Griffin was not a remote supervisor. He entered MPD's decision chain in March 2023 and remained personally involved after becoming Chief. By May 2023, Griffin had personally heard Plaintiffs describe Fisher's statements that they were Indian immigrants on visas, not United States citizens, had heavy accents, did not own their home, and were not allowed to call 911. In February 2024, as Chief, Griffin personally researched, responded to, and routed Fisher's request for assistance, including her report of a claimed threat, while during the same week initially telling Mr. Sriganesha that his complaint was civil, "Unfounded," and would not be assigned to a detective. Griffin later placed "all facets" of Plaintiffs' matters under one captain, referred internally to the "why" behind MPD's handling of those matters, and, after receiving Plaintiffs' written complaint expressly alleging racial discrimination and unequal police treatment, concluded there was "no evidence of any employee misconduct."

4. The treatment continued after that determination. In October 2024, Fisher posted on the Nextdoor platform identifying Mr. Sriganesha by name and

photograph, displaying Plaintiffs' home address, and accusing him of being a child predator and of smuggling illegal items into the United States. Unknown individuals responded with comments discussing firearms and stating that they would come to Plaintiffs' home and shoot Mr. Sriganesha. Plaintiffs reported the posts and threats to MPD and told senior City officials that their two minor children lived in the home. Sergeant Ivo Pereira wrote that the information would be reviewed by MPD's Criminal Investigation Division; no detective contacted Plaintiffs, interviewed them, or requested evidence, and Pereira later told them by telephone that CID had concluded there was no criminal conduct and would take no action. In January 2026, Plaintiffs reported threatening messages containing racial and immigration insults; MPD routed the report to CID, which again closed it without any detective contacting Plaintiffs. In February 2026, after Plaintiffs had litigated the March 2023 events to a final judgment against Fisher—the civil judgment MPD had told Plaintiffs in March 2023 to obtain first—Plaintiffs asked MPD to consider that judgment together with the video of the March 2023 events, including Fisher's recorded statements, that MPD had received on Plaintiffs' June 2023 thumb drive. MPD's review did not address that video, and MPD later relied again on the survey rationale it had invoked in 2023.

5. Plaintiffs do not ask this Court to order the arrest, prosecution, extradition, or investigation of Fisher or anyone else, and they seek no relief

measured by whether any person is charged. The police services at issue are response, investigation, evidence handling, detective assignment, information, and command review. Plaintiffs seek damages under 42 U.S.C. § 1983 for a completed injury of their own: the intentional denial of equal treatment in the provision and administration of those services because of race and national origin.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4) because the claims arise under the Fourteenth Amendment and 42 U.S.C. § 1983.

7. Venue is proper under 28 U.S.C. § 1391(b) because Defendants reside in this District and the events giving rise to the claims occurred in Milton, Fulton County, Georgia, within this District.

## III. PARTIES

8. Plaintiffs are married United States citizens of Sri Lankan national origin who own and reside at 315 Eagles Pass, Milton, Georgia, with their two minor children. Fisher described them to MPD as "Indians," and MPD's own records thereafter identified Mr. Sriganesha as "INDIAN."

9. Defendant City of Milton, Georgia is a municipal corporation organized under a council-manager charter. It operates the Milton Police Department.

10. Defendant Jason Griffin was an MPD Captain and Uniform Patrol Commander in March 2023 and became Chief of Police in December 2023. Under Milton Code of Ordinances § 28-20(a), the Chief of Police, under the City Manager's general direction, directs the administration and operation of all services of the police department, including its criminal investigation function, and establishes the department's policies and directives. Griffin is sued in his individual capacity for his own acts under color of state law.

## IV. FACTS

### A. March 2023: the same events, different police treatment

11. Fisher then owned the adjoining property at 305 Eagles Pass. On or about March 10, 2023, she contacted MPD Officer Zachary O'Neill about trees near the shared boundary. MPD Internal Affairs Inquiry 23-004 records Fisher describing Plaintiffs as "Indians on a work visa" with a "heavy accent." Plaintiffs were United States citizens. MPD records thereafter identified Mr. Sriganesha as "INDIAN" or "INDIAN MALE."

12. Fisher had no permission from Plaintiffs to cut or remove any trees from Plaintiffs' property, and Plaintiffs had no notice before March 15, 2023 that any cutting was planned. MPD authorized a civil standby for Fisher's tree work; no one from MPD contacted Plaintiffs before it. On March 15, 2023, a man accompanying Fisher knocked on Plaintiffs' door and told them to move their car

out of their own driveway. That was the first Plaintiffs learned of the planned cutting.

13. Fisher, Dennis Guaracino, and an Emergency Tree USA crew then entered the area along the boundary and, over approximately six hours, cut or damaged trees that Plaintiffs' survey placed on Plaintiffs' property, damaged Mr. Sriganesha's truck, and destroyed the children's basketball backstop. Plaintiffs called 911 while the cutting continued. MPD's stated reason for treating the matter as civil was that officers understood Fisher to have a survey placing the trees on her side. On the body-worn-camera recording, Officer O'Neill described Plaintiffs as calm while attempting to calm Fisher. Sergeant Chad West nevertheless stated to Plaintiffs, in substance, that if the situation became criminal, someone was probably going to end up in jail.

14. Near the end of the episode, Fisher told Plaintiffs, in a recording later delivered to MPD: ". . . I cut these down, so I don't have to hear your mouth anymore . . . You are new to the US . . . You are not allowed to call 911 . . . Your fence is going to come down next . . . ." That recording was among the videos Plaintiffs delivered to MPD on June 12, 2023 (¶ 28).

15. Between March 18 and March 23, Plaintiffs told MPD that their survey marked the property line, identified the trees their survey showed had been cut within that line, told officers they had recordings, and asked whether MPD

would protect the property if Fisher or her contractors crossed the marked line again. O'Neill answered that the matter was "entirely a civil issue," that officers understood Fisher to have an independent survey, and that MPD would not become involved unless ownership was undisputed. Plaintiffs disputed that premise, asked what survey MPD had relied on, and asked to meet with the Chief.

**B. Griffin enters the decision chain**

16. Griffin personally received and acted on that exchange. On March 23, 2023, he asked internally whether anyone had responded to Plaintiffs' request to meet the Chief. He then forwarded the chain to Lieutenant Chad Taylor, directed Taylor to review it and speak with West and O'Neill if needed, stated that the matter appeared civil, and directed that it be handled at the lieutenant level.

17. The next day, Taylor told Plaintiffs that police could not decide disputed ownership and that police could enforce the result after a civil judge resolved the dispute and entered an order.

18. On March 28, Griffin said the same thing in writing: "Once a judgment or order is given and signed by a Fulton County Judge, we can then step in and enforce said order."

19. On April 13, Plaintiffs again sought command review. Griffin forwarded the request to then-Chief George "Rich" Austin. Austin told Griffin: "Please look in on this matter in my absence."

**C. May 2023: Griffin hears the race allegations himself**

20. In May, Plaintiffs escalated the matter to Chief Austin, City Manager Steven Krokoff, the Mayor, and Councilmembers. They supplied photographs, survey and plat materials, statutes, and Griffin's March 28 email. Krokoff responded that, as City Manager, he was responsible for the City's day-to-day operations and citizen services, that he had reviewed the matter with Austin and Community Development, and that the City would examine it further.

21. Before the May 23 meeting, Plaintiffs told Austin in writing that they would bring a flash drive containing Fisher's "racially motivated comments," Fisher's police communications, and body-camera footage. Austin said he had received a command-staff update and would consider the additional information.

22. On May 23, Plaintiffs met with Austin, Griffin, other MPD command personnel, and Community Development staff. Griffin was physically present. In his presence, Plaintiffs described Fisher's statements that they were Indian immigrants on visas, not United States citizens, had heavy accents, did not own their home, and were not allowed to call 911. Plaintiffs told command staff they believed those statements had affected how MPD treated them.

23. The City directed Plaintiffs to the Fulton County citizen-warrant process. Plaintiffs asked for Fisher's date of birth, which the application required. Chief Austin indicated that MPD would provide it. After the meeting, while Griffin

escorted Plaintiffs downstairs, Griffin told them in substance that MPD would not provide Fisher's date of birth because Fisher could sue the City if MPD took action against her.

24. Two days later, Plaintiffs memorialized the meeting in an email to Krokoff, copied to Austin, the Mayor, and Councilmembers. They complained of unequal police treatment, repeated Fisher's race-, accent-, and immigration-related remarks, and wrote that "Captain Griffin said that MPD fears that Ms. Fisher can sue the city if they take actions." Krokoff replied that the information would be "helpful in my analysis."

25. That same day, Lieutenant Christopher Bradshaw checked the Magistrate Court docket for Plaintiffs' filings, conferred with Griffin about whether Mr. Sriganesha had a warrant-application hearing, and reported Griffin's understanding directly to Fisher. In the same exchange, Fisher asked whether Plaintiffs had been told not to use 911. MPD checked Plaintiffs' court status for Fisher the same week it declined to provide Plaintiffs the date of birth needed for the citizen-warrant process.

26. Krokoff then undertook his own review. He analyzed whether Georgia criminal-trespass and criminal-damage statutes could apply, sought legal review, and proposed a conference with the Fulton County District Attorney's Office at which "all the evidence provided by both parties" and the City's findings would be

presented. He wrote that if the District Attorney found a prosecutable case, he would ask Austin to direct investigators to seek a warrant.

**D. June 2023: whose evidence received investigative treatment**

27. On June 9, Lieutenant Scott Lappin wrote internally that many calls between the parties existed only as "CAD notes"; that "the only case I can think of where the detectives conducted case follow ups" concerned Fisher's complaints against Mr. Sriganesha; and that he "honestly [did not] know what exact case file we have to provide" to the District Attorney. The same day, Bradshaw wrote directly to Fisher that MPD was "not pursuing any criminal charges at this time."

28. On June 12, Lieutenant Andrew Noblett confirmed that he had received Plaintiffs' thumb drive of audio and video evidence of the March 15 events—including the recording in which Fisher stated that she had cut the trees "so I don't have to hear your mouth anymore," that Plaintiffs were "not allowed to call 911," and that their "fence is going to come down next"—and wrote: "I will also share your thumb drive with our Detectives." The next day, Plaintiffs again identified Fisher's statements that they were Indian, on work visas, new to the United States, and not allowed to call 911. Noblett acknowledged receipt and said he needed time to review the documentation and videos.

29. On June 30, Chief Austin told Plaintiffs that MPD had conducted a "thorough review from both an internal affairs and a criminal investigations

perspective"; that an internal legal review considered the dispute civil; that the CID commander had met with the District Attorney's Office, which declined prosecution; and that Internal Affairs found officers acted within policy. MPD closed its internal and criminal avenues. Austin also acknowledged that Plaintiffs needed Fisher's date of birth for the citizen-warrant process but gave a different reason for withholding it than Griffin had given: information-release restrictions.

30. In 2026, the City responded to Plaintiffs' Open Records requests by stating that no chain-of-custody record existed for the thumb drive because it "was not received or maintained as evidence in a criminal investigation," although information from the drive had been retained electronically. That later disclosure sits beside four contemporaneous facts: the drive contained Fisher's recorded statements about the cutting and the fence; Noblett promised to share the drive with detectives; Austin described a "thorough" criminal-investigations review; and Lappin had written that he did not know what exact case file MPD had to provide the District Attorney.

31. Fisher's survey and protective-order submissions, by contrast, were accepted, retained, and routed among identified MPD command personnel. Plaintiffs allege the difference in evidence handling and detective follow-up as part of the unequal administration of police services.

**E. August 2023: same officer, eleven days, opposite results**

32. On August 20, 2023, MPD arrested Mr. Sriganesha on a misdemeanor stalking warrant arising from Fisher's accusation that he was recording her. Moore-Whittington's own report recorded the critical facts: the device was a non-functioning cellphone resting inside Plaintiffs' home on a window; and the phone was not recording. Mr. Sriganesha was not holding it. The charge was later dismissed and the record restricted.

33. Eleven days later, on August 31, Mrs. Sriganesha reported to Moore-Whittington that Fisher was holding a cellphone and pointing it toward Plaintiffs' minor children while they were preparing to go to school in Plaintiffs' driveway. Plaintiffs identified witnesses and provided security-camera footage documenting the incident. Moore-Whittington—the same officer involved in Mr. Sriganesha's arrest eleven days earlier—handled the report and closed it "Unfounded" the following day.

34. The comparison is concrete. Both complaints concerned a cellphone alleged to be directed from one household's property toward the other household. In the first incident, the alleged recording device was a non-functioning phone resting inside Plaintiffs' home; Mr. Sriganesha was not holding it, and it was not recording. MPD nevertheless arrested him on the Fisher-related allegation. Eleven days later, Fisher was holding a phone and pointing it toward Plaintiffs' minor

children in their driveway; Plaintiffs supplied witnesses and footage; and the same officer closed the report "Unfounded" the next day. Plaintiffs allege the materially different police response to these closely related surveillance complaints as one example of the unequal administration of police services at issue here.

**F. 2024: Griffin remains in control after becoming Chief**

35. In December 2023, Plaintiffs reported escalating camera surveillance, threats, and safety concerns under Case No. 23-01755. MPD classified the matter as no crime, "Unfounded," and a "courtesy report," with no detective assignment.

36. On February 12, 2024, Mr. Sriganesha sent Griffin, the Mayor, and the City Council a formal written complaint concerning the August 2023 arrest and requested an internal investigation.

37. Between February 20 and 26, Fisher emailed Chief Griffin directly seeking help concerning the dismissed stalking charge, a claimed threat, and a police report. Griffin personally researched MPD's records, responded, attached a report, corrected Fisher's gun-threat assertion, and routed her second request to Sergeant Lappin. During the same week, Griffin initially told Mr. Sriganesha that Case No. 24-00334 was civil, "Unfounded," and would not be assigned to a detective. MPD later conducted additional CID review, but Griffin had already personally classified and communicated the matter while personally handling Fisher's request. Griffin's handling of Fisher's claimed threat—personal research

of MPD's records, a written response, and a correction of the record—is the treatment MPD gave a threat complaint from Fisher.

38. On March 4, Krokoff forwarded Plaintiffs' renewed safety complaint to Griffin and wrote: "We need to do our best to defuse it." Griffin responded that Captain Barstow would be the point of contact "moving forward in all his matters," apologized that Mr. Sriganesha "keeps looping in city hall," and said he would make sure Plaintiffs understood the "why" behind MPD's handling of "all facets" of the cases.

39. Barstow and Lappin met with Plaintiffs on March 8. On March 11, Barstow interviewed Plaintiffs' attorney about mail Fisher had obtained unlawfully. The mail was confidential attorney-client correspondence sent by Plaintiffs' attorney to Mr. Sriganesha and was intended for him, not Fisher. Plaintiffs' attorney told Barstow that he had not provided the correspondence to Fisher and that Fisher had not obtained it through him or any authorized legal channel. Despite that information, Barstow left Case No. 24-00334 classified "Unfounded" on March 13 on jurisdictional and legal grounds. Meanwhile, when Fisher asked Lieutenant Noblett on March 12 to "briefly connect," Noblett routed her directly to Barstow and told her Barstow would contact her.

40. In July 2024, Plaintiffs submitted a detailed written complaint expressly alleging racial bias and unequal police treatment. On August 6, Griffin

responded that, after reviewing officers' interactions with Plaintiffs and Fisher, MPD had found "no evidence of any employee misconduct towards anyone involved." From that date at the latest, Griffin had actual, documented notice that Plaintiffs alleged the Department's treatment of them was racially discriminatory.

**G. After August 25, 2024: the challenged administration continues**

41. In October 2024, Fisher published posts on the Nextdoor platform identifying Mr. Sriganesha by name and photograph, displaying Plaintiffs' home address, and accusing him of being a child predator and of smuggling illegal items into the United States. In response to Fisher's posts, unknown individuals made comments discussing firearms and stating that they would come to Plaintiffs' home and shoot Mr. Sriganesha. Plaintiffs reported the posts and comments to MPD and informed senior City officials that two minor children lived in the home. MPD's records identified Mr. Sriganesha as "INDIAN" (¶ 11), and the posts themselves referred to his supposed foreign origin.

42. On October 20, 2024, Sergeant Ivo Pereira wrote to Mr. Sriganesha that "[a]ll this information will be added to the report and will be reviewed by our Criminal Investigation Division" and that "[a]ny further updates will have to be through them once your report is assigned." No detective thereafter contacted, interviewed, or requested anything from Plaintiffs. Instead, Pereira told Mr. Sriganesha by telephone, in substance, that CID had concluded there was no

criminal conduct and would take no action. Fisher's own complaints against Mr. Sriganesha had received detective follow-up (¶ 27) and, in August 2023, a warrant that MPD executed (¶ 32); eight months before the October 2024 report, when Fisher had raised a claimed threat with Griffin, he had personally researched MPD's records and answered her in writing (¶ 37). City Manager Krokoff thereafter responded personally: he characterized the broader dispute as "blame-shifting," noted that Fisher had moved and suggested that Plaintiffs consider doing the same, directed Plaintiffs to report any criminal activity to the police, and stated that his message was not an invitation to further engagement.

43. On January 13, 2025, a Fulton County Magistrate issued a felony warrant against Fisher arising from the March 15, 2023 events. The next day, Plaintiffs asked Griffin about MPD's handling of the warrant and how MPD knew Fisher had moved to Florida. Griffin replied that coordination with Florida would be "fruitless at this point" and said Fisher herself had told an MPD officer she moved. After Plaintiffs asked for the details, Griffin corrected the factual basis: "[n]o statement was made to us by Ms. Fisher stating she has moved to Florida," and "I apologize for assuming that earlier."

44. On December 29, 2025, the State Court of Fulton County entered final judgment for Plaintiffs against Fisher, Guaracino, and Emergency Tree USA, LLC on claims arising from the March 15, 2023 tree-cutting episode, awarding

compensatory damages, punitive damages, and attorney's fees. The civil process MPD had repeatedly invoked had thus produced a final judgment arising from the same episode.

45. On January 1–2, 2026, Plaintiffs separately reported threatening messages containing racial and immigration insults, deportation and "ICE" language, references to their children, and language about watching Plaintiffs. MPD classified the report as Harassing Communications and routed it to CID. The matter was thereafter closed without any detective contacting Plaintiffs, interviewing them, requesting additional evidence, or providing Plaintiffs any investigative follow-up or disposition—as with the October 2024 report (¶ 42). The messages themselves referred to Plaintiffs' race and national origin. MPD thus knew how to route a threat report to detectives; what Plaintiffs did not receive, on either report, was any investigative contact—or the personal research, written answer, and command attention that MPD had given Fisher's claimed threat (¶ 37).

46. On February 11, 2026, Plaintiffs returned to Chief Griffin with the December 2025 judgment, identified the video evidence of the March 15, 2023 events—including Fisher's recorded statements—that Plaintiffs had previously submitted to MPD on the June 12, 2023 thumb drive (¶ 28), and asked MPD to consider that judgment together with the previously submitted video in light of its 2023 disposition.

47. On March 30, 2026, counsel writing on behalf of MPD stated that MPD would not open a criminal investigation or pursue charges. MPD had received in June 2023 the thumb drive containing the identified video (¶¶ 28–30); the March 30 response did not address that previously submitted video or state whether it had been considered.

48. On April 2, Plaintiffs challenged that disposition in writing, copied Griffin, Krokoff, and the Mayor, and again raised unequal police treatment. On April 17, counsel again relied on the survey conflict—the ownership issue MPD had said in 2023 required judicial resolution—notwithstanding that Plaintiffs had by then obtained final judgment on claims arising from the same March 15, 2023 tree-cutting episode (¶ 44). Plaintiffs answered on April 27. On April 28, counsel, copying Krokoff and Griffin, wrote that the April 17 response "constitutes the City of Milton's final position on this issue."

49. The February 11 request was addressed to Griffin as Chief; counsel responded for MPD; the April 2 challenge was sent to Griffin; and the April 28 "final position" was copied to him, and Plaintiffs received nothing countermanding it. Under Milton Code § 28-20(a), the decision whether MPD's criminal investigation function would act on a resident's request is one the Chief directs. On information and belief, based on those facts, Griffin made, approved, or maintained MPD's 2026 investigative disposition.

### H. The service comparison

50. The following representative events identify the municipal police services at issue and the treatment alleged:

| Request / actor | Service sought | MPD response |
|---|---|---|
| Mar. 2023 — Fisher | Police presence for boundary/tree work, requested without notice to Plaintiffs | Civil standby provided; Plaintiffs not contacted. (¶ 12) |
| Mar. 2023 — Plaintiffs | Protection during and after the cutting | Treated as civil; arrest warning on scene; command review routed below Chief level; told judicial resolution was required. (¶¶ 13–19) |
| May 2023 — Fisher | Court-status information about Plaintiffs | Bradshaw checked docket, conferred with Griffin, reported back to Fisher. (¶ 25) |
| May–June 2023 — Plaintiffs | Date of birth for City-recommended citizen-warrant process | Withheld; Griffin cited potential suit by Fisher; Austin later cited release restrictions. (¶¶ 23–25, 29) |

| **Request / actor** | **Service sought** | **MPD response** |
|---|---|---|
| June 2023 — both sides | Investigative follow-up and evidence handling | Detective follow-up recalled only on Fisher's complaints; Plaintiffs' drive, including Fisher's recorded statements, promised to detectives but never maintained as criminal evidence. (¶¶ 27–31) |
| Aug. 2023 — Fisher / Plaintiffs | Surveillance complaints eleven days apart, same officer | Fisher's allegation: Mr. Sriganesha arrested although the phone was non-functioning, inside Plaintiffs' home, not held by him, and not recording. Plaintiffs' report, with witnesses and footage, of Fisher holding a phone toward the children: closed "Unfounded" next day. (¶¶ 32–34) |
| Dec. 2023 — Plaintiffs | Surveillance, threats, and safety concerns | "Unfounded"; "courtesy report"; no detective. (¶ 35) |

| **Request / actor** | **Service sought** | **MPD response** |
|---|---|---|
| Feb. 2024 — Fisher / Plaintiffs | Command access; threat complaint; case handling | Griffin personally researched, answered, and routed Fisher's requests, including her claimed threat; same week initially told Plaintiffs their case was civil, "Unfounded," no detective; later CID review left the classification unchanged. (¶¶ 37, 39) |
| Oct. 2024 — Plaintiffs | Posts naming home and children; child-predator accusation; firearms and shooting comments | Sergeant wrote CID would review; no detective contact; told by telephone: not criminal, no action. City Manager: "blame-shifting"; consider moving. (¶¶ 41–42) |
| Jan. 2026 — Plaintiffs | Threatening messages with racial and immigration content | Routed to CID; closed without contacting Plaintiffs. (¶ 45) |

| Request / actor | Service sought | MPD response |
|---|---|---|
| Feb.–Apr. 2026 — Plaintiffs | Consideration of the judgment together with video previously submitted on the June 2023 thumb drive | Review did not address the previously submitted video; survey rationale revived; "final position" announced. (¶¶ 46–49) |

## V. TIMELINESS

51. Plaintiffs filed this action on August 25, 2026. Georgia's two-year personal-injury limitations period applies to § 1983 claims; federal law governs accrual.

52. This First Amended Complaint alleges police-service decisions within two years of filing, each a disposition of a request by Plaintiffs for municipal police services: MPD's October 2024 handling and disposition of Plaintiffs' report of threats concerning their identified home and children (¶¶ 41–42); Griffin's January 2025 personal handling of Plaintiffs' request for information, in which he supplied a factual basis he later withdrew (¶ 43); MPD's January 2026 handling and closure of Plaintiffs' Harassing Communications report without investigative

contact (¶ 45); and MPD's 2026 handling of Plaintiffs' request that it consider previously submitted video evidence together with the later judgment, including the City's resulting command-level review and final disposition (¶¶ 46–49). Earlier events are pleaded because they establish comparator treatment, Griffin's knowledge and personal role, discriminatory purpose, and the factual context in which the timely police-service decisions occurred.

53. In the alternative, Plaintiffs' claims arising from the March 15, 2023 events are also timely under O.C.G.A. § 9-3-99. Plaintiffs were the victims of an alleged crime committed in Fulton County, Georgia on March 15, 2023, when Fisher, Guaracino, and their crew entered Plaintiffs' property and cut and damaged Plaintiffs' trees and property (¶ 13). In June 2023 the District Attorney's Office declined to initiate a prosecution based on the matter MPD then presented (¶ 29); no accusation, indictment, or charge was brought at that time. On January 13, 2025, a Fulton County Magistrate found probable cause and issued a felony arrest warrant against Fisher for criminal damage to property arising from those events (¶ 43). As of the filing of this action, that warrant had not been executed; no accusation or indictment had been returned; no court had dismissed or otherwise terminated the charge; and the period for commencing prosecution of that felony under O.C.G.A. § 17-3-1 had not expired. Plaintiffs' claims concerning Defendants' response to, handling of, and treatment of Plaintiffs as the victims of

that alleged crime—including the civil standby, the classification of the March 2023 events as civil, the withholding of the date of birth required for the citizen-warrant process, the handling of Plaintiffs' evidence, the District Attorney referral and June 30, 2023 disposition, and the review of Plaintiffs' 2024 written complaint concerning that treatment (¶¶ 12–31, 40)—arise out of the facts and circumstances relating to the commission of that alleged crime. Plaintiffs invoke § 9-3-99 as an additional and alternative basis for the timeliness of those claims.

## VI. COUNT I — EQUAL PROTECTION

### 42 U.S.C. § 1983 — Jason Griffin, Individual Capacity

54. Plaintiffs incorporate Paragraphs 6 through 53.

55. The Equal Protection Clause of the Fourteenth Amendment prohibited Griffin, acting under color of state law, from intentionally administering municipal police services on the basis of race or national origin. Plaintiffs' injury is the unequal governmental treatment they themselves received in the provision and administration of those services.

56. Griffin personally participated. He received and acted on Plaintiffs' March 2023 escalation (¶ 16); stated MPD's judicial-order condition (¶ 18); acted at Austin's direction (¶ 19); heard the protected-class allegations in May 2023 (¶ 22); told Plaintiffs MPD would not provide Fisher's date of birth because Fisher could sue the City (¶ 23); conferred on Plaintiffs' court activity that was then

reported to Fisher (¶ 25); personally handled Fisher's requests, including her claimed threat, while initially classifying Plaintiffs' complaint as civil, "Unfounded," and unassigned (¶ 37); centralized "all facets" of Plaintiffs' matters under a single commander answering to him and referred to an unstated "why" (¶ 38); issued the August 2024 no-misconduct determination after receiving the written discrimination complaint (¶ 40); personally handled the January 2025 request and corrected his factual premise only after challenge (¶ 43); and, on information and belief supported by Paragraph 49, made, approved, or maintained MPD's 2026 disposition.

57. The differential treatment was concrete. It involved police presence, classification, evidence intake, detective assignment, command access, information sharing, investigation, and review. It included the service comparisons in Paragraphs 12–15, 25, 27–31, 32–34, 37–42, and 45–48, summarized in Paragraph 50.

58. The facts support a reasonable inference of discriminatory purpose. Fisher introduced race, accent, immigration status, and citizenship into her first contact with MPD, before any service was rendered, and MPD's own records preserved that framing. MPD's first service in the matter—the standby—went to Fisher, on her account alone, without contact with Plaintiffs. Griffin personally heard the protected-class allegations in May 2023. He then gave a Fisher-

protective explanation for withholding information Plaintiffs needed, while MPD checked and relayed Plaintiffs' court status to Fisher the same week.

59. MPD's own lieutenant described the only detective follow-up he could recall as concerning Fisher's complaints, while many of Plaintiffs' calls remained CAD notes. Plaintiffs' thumb-drive evidence—including Fisher's recorded statements that she cut the trees "so I don't have to hear your mouth anymore" and that Plaintiffs' fence would "come down next"—was promised to detectives but was never maintained as criminal evidence. The same officer handled the August 2023 surveillance complaints eleven days apart: Mr. Sriganesha was arrested over a non-functioning phone inside his home that was not recording, while Fisher's act of holding a phone toward Plaintiffs' minor children—supported by witnesses and security footage—was closed "Unfounded" the next day. In February 2024, Griffin personally researched and answered Fisher's claimed threat while telling Plaintiffs their complaint was "Unfounded" and would initially get no detective. In October 2024, MPD represented that Plaintiffs' threat report would receive CID review, yet no detective contacted them; in January 2026, MPD routed another threat report to CID and again closed it without detective contact.

60. In March 2024, Griffin referred to an unstated "why" governing "all facets" of Plaintiffs' matters. After Plaintiffs formally alleged racial discrimination,

Griffin found no misconduct. In January 2025, Griffin supplied a factual premise he later withdrew. In 2026, after Plaintiffs submitted the judgment and identified the video previously delivered to MPD, MPD's review did not address that video and later returned to the survey rationale it had invoked in 2023. Taken together, the sequence, comparisons, knowledge, departures from ordinary handling, and shifting explanations plausibly support intentional discrimination.

61. Griffin's conduct caused Plaintiffs to be denied equal governmental treatment and caused compensable injury. His conduct was intentional, reckless, or callously indifferent to Plaintiffs' federally protected rights.

## VII. COUNT II — MUNICIPAL LIABILITY

### 42 U.S.C. § 1983 — City of Milton, Georgia

62. Plaintiffs incorporate Paragraphs 6 through 53.

63. Milton operates under a council-manager form of government. Under § 3.25 of the City Charter, the City Manager is "the chief administrative officer of the city" and shall "[d]irect and supervise the administration of all departments, offices, and agencies of the city" and "[s]ee that all laws . . . are faithfully executed." Under Charter § 4.10(d), each department director, including the Chief of Police, is "subject to the direction and supervision of the city manager" in "the administration and direction of the affairs and operations" of the department. Under Milton Code § 2-136, each department head "shall report and make

recommendations to the city manager," and "[t]he city manager or his or her designee shall supervise each department." Under Milton Code § 28-20(a), the Chief of Police, "[u]nder the city manager's general direction," directs "the administration and operation of all services of the city police department" and "establish[es] the policies, directives, rules and regulations for the administration and operations of the department."

64. Under Charter § 3.28, the City Council and its members "shall deal with city officers and employees who are subject to the direction and supervision of the city manager solely through the city manager," and may not give orders to any such officer or employee. The Charter designates the Mayor as "the chief executive officer of the city government," responsible for "the enforcement of laws, rules, regulations, ordinances, and franchises" (§ 3.22(a)); makes departments "subject to the general supervision and guidance of the mayor and councilmembers" (§ 3.10(d)); and authorizes Council "inquiries and investigations" (§ 3.12). None of those provisions establishes any procedure for, or right to, review of the disposition of an individual resident's request for police services, and none permits the Mayor or Council to direct the officers who make those dispositions except through the City Manager. Plaintiffs escalated their complaints to the Mayor and Councilmembers in May 2023 and February 2024,

and to the Mayor in April 2026 (¶¶ 20, 24, 36, 48). Plaintiffs received no response from the Mayor or any Councilmember, and no disposition was altered or reversed.

65. Accordingly, for the specific administrative function challenged here—the City's review, classification, evidence handling, investigative assignment, and final disposition of residents' requests for municipal police services—final policymaking authority within the City rests with the City Manager, and the City Manager exercised that authority here. The Charter makes the City Manager the City's chief administrative officer, directs him to supervise City departments, and requires the Council and its members to deal with officers subject to his supervision through him (¶¶ 63–64). No municipal administrative appeal from, or other review of, Krokoff's dispositions was provided to Plaintiffs, despite their repeated escalations to the Mayor and Council (¶ 64). Krokoff invoked that authority when he told Plaintiffs in May 2023 that, as City Manager, he was responsible for the City's day-to-day operations and citizen services, and he then personally undertook review of Plaintiffs' police-service complaint (¶ 20).

66. Krokoff did not merely receive reports. He reviewed Plaintiffs' complaint with the Chief and Community Development (¶ 20); received the May 25, 2023 written allegation of unequal treatment and Griffin's stated concern about suit by Fisher, and called that information "helpful in my analysis" (¶ 24); personally analyzed the relevant criminal statutes and prescribed the District

Attorney review process, stating that if a prosecutable case existed he would have the Chief direct investigators to seek a warrant (¶ 26); forwarded Plaintiffs' renewed March 2024 complaint to Griffin with the instruction that "[w]e need to do our best to defuse it," and received Griffin's report that "all facets" of Plaintiffs' matters would be handled through a single commander (¶ 38); personally responded to Plaintiffs' October 2024 request for help by characterizing the dispute as "blame-shifting," suggesting that Plaintiffs consider moving, and declining further engagement (¶ 42); and received the April 2, 2026 written challenge, which again raised unequal police treatment, and the April 28, 2026 correspondence announcing "the City of Milton's final position" (¶ 48). Each act after May 25, 2023 was taken after the City had been told in writing that Plaintiffs alleged racially discriminatory police treatment—on May 25, 2023 (¶ 24), in July 2024 (¶ 40), and on April 2, 2026 (¶ 48).

67. Krokoff did not merely fail to correct subordinate conduct. He personally undertook substantive review of Plaintiffs' police-service complaints; prescribed the 2023 review process and the June 30, 2023 disposition that followed it (¶¶ 26, 29); responded personally to Plaintiffs' October 2024 safety complaint (¶ 42); received repeated written allegations of racial discrimination (¶¶ 24, 40, 48); and participated in the City's 2026 review culminating in the communication expressly denominated "the City of Milton's final position" (¶ 48). Each of those

decisions was made or maintained after the City had been told in writing that Plaintiffs alleged racially discriminatory police treatment. Those were the City's own administrative decisions, and the resulting course of treatment continued the unequal provision and administration of police services described above.

68. In the alternative, to the extent particular MPD service dispositions fell within the Chief of Police's authority under Milton Code § 28-20(a), were not reviewed or altered by the City Manager, and were not subject to further municipal administrative review, those dispositions were final decisions of the City for that function. Those dispositions include Griffin's August 6, 2024 no-misconduct determination (¶ 40) and Griffin's 2025–2026 dispositions (¶¶ 43, 47–49).

69. Those municipal decisions denied Plaintiffs equal treatment in the provision and administration of police services because of race and national origin, in violation of the Fourteenth Amendment, and were a moving force behind the unequal treatment alleged above and Plaintiffs' resulting injuries.

## VIII. DAMAGES

70. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered denial of equal treatment by their municipal police department; emotional distress, humiliation, fear, and loss of security in their home; fear for their children during the October 2024 threats that MPD declined to treat as criminal and the January 2026 threats that MPD closed without contact; and out-of-pocket expenses

for security measures and records requests incurred while attempting to obtain the police services and review described above.

71. Plaintiffs seek nominal damages for each completed constitutional violation and punitive damages against Griffin as permitted by law. Plaintiffs do not seek punitive damages against the City.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(a) enter judgment for Plaintiffs on Counts I and II;

(b) award compensatory damages in an amount determined by the jury;

(c) award nominal damages;

(d) award punitive damages against Griffin in an amount determined by the jury;

(e) award costs and, to the extent available, attorney's fees under 42 U.S.C. § 1988;

(f) award pre- and post-judgment interest as permitted by law; and

(g) grant such other relief as is just and proper.

## X. JURY DEMAND

72. Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted this 16th day of September, 2026.

Sellathurai ("Ganesh") Sriganesha, Plaintiff, pro se
315 Eagles Pass, Milton, Georgia 30004
Email: ganesh.sellathurai@gmail.com
Telephone: (864) 498-9953

Sangeetha Sriganesha, Plaintiff, pro se
315 Eagles Pass, Milton, Georgia 30004
Email: sangee.ganesh@gmail.com
Telephone: (864) 252-6658

**CERTIFICATE OF COMPLIANCE WITH L.R. 5.1(C)**

Pursuant to Local Rule 7.1(D), I certify that the foregoing has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C), specifically Times New Roman 14-point font.

## CERTIFICATE OF SERVICE

I certify that on September 16, 2026, I served a true and correct copy of the foregoing First Amended Complaint on counsel for Defendants by depositing it in the United States Mail, first-class postage prepaid, with a courtesy copy by email, addressed to:

J. Scott Key
J. Scott Key, LLC
199 West Jefferson Street
Madison, Georgia 30650
scott@scottkeylaw.com

Sellathurai ("Ganesh") Sriganesha