**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| Sellathurai ("Ganesh") Sriganesha and Sangeetha Sriganesha,<br><br>Plaintiffs,<br><br>v.<br><br>City of Milton, Georgia; and Jason Griffin, in his individual capacity,<br><br>Defendants. | Case No.:<br>1:26-cv-4820-SEG |

**Brief in Support of Defendants' Renewed Motion to Dismiss**
**First Amended Complaint**

Plaintiffs amended once. The First Amended Complaint ("FAC") adds new facts — a threat report, harassing messages, a flash drive of old evidence — but the case still has the same three defects at its core.[1] Part of Count I asks this Court to decide whether Fisher should have been extradited and prosecuted more aggressively. No one has standing to bring that claim, whatever label is attached to it. What remains of Count I turns on one favorable comparison Chief Griffin made for Fisher in February 2024. No case holds that this kind of complaint-triage decision violates a clearly established right, so qualified immunity still protects

[1] *See* Doc. 8.

him. And Count II blames the City for a decision the City's own ordinance places with the Chief, not the City Manager, and then, in the alternative, tries to make Griffin's routine case-by-case calls into City policy, which *Monell* does not allow.

Defendants move to dismiss on four independent grounds. First, under Federal Rule of Civil Procedure 12(b)(1), Plaintiffs lack Article III standing to bring the Fisher-prosecution slice of Count I. Second, under Rule 12(b)(6), Chief Griffin is entitled to qualified immunity on the balance of Count I. Third, under Rule 12(b)(6), neither final-policymaker theory pled in Count II states a claim against the City. Fourth, the pre-2024 conduct Plaintiffs plead as background is not independently timely, and O.C.G.A. § 9-3-99 does not save it. The Court should resolve standing first, because it is jurisdictional and potentially dispositive of part of the case.[2]

## Statement of the Case

Five days before the events at the center of this case, Fisher had described Plaintiffs to an MPD officer as "Indians on a work visa" with a "heavy accent."[3] Both statements were false; Plaintiffs are United States citizens.[4] On March 15,

[2] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).
[3] Doc. 8 at ¶ 11.
[4] *Id*.

2023, Fisher had a tree crew cut trees along the property line dividing her home from Plaintiffs', over Plaintiffs' objection and without their permission.[5]

The tree-cutting produced the one allegation of criminal conduct anywhere in this three-year dispute — potential criminal trespass and criminal damage to property. City Manager Steven Krokoff personally analyzed whether those statutes applied, sought legal review, and arranged a conference with the Fulton County District Attorney's Office, which reviewed the evidence from both sides and declined to prosecute.[6] Defendant Jason Griffin was an MPD captain during the early events and became Chief of Police in December 2023; under Milton Code § 28-20(a), the Chief, under the City Manager's general direction, directs the administration and operation of all police services, including criminal investigations, and establishes the department's policies and directives.[7]

Over the following three years, the tree dispute produced a long series of dueling police contacts between the two households, which Plaintiffs plead in a table of the specific decisions they challenge.[8] Of those, Plaintiffs identify four decisions falling within the two-year limitations period: MPD's October 2024 handling of a threat report naming Plaintiffs' children; Chief Griffin's January

---

[5] *Id*. at ¶¶ 8, 11-13.
[6] *Id*. at ¶¶ 20, 26, 29.
[7] *Id*. at ¶¶ 10, 26, 29.
[8] *See id*.

2025 personal response to Plaintiffs' request for help locating and extraditing Fisher; MPD's January 2026 closure of a harassing-communications report; and MPD's 2026 review of Plaintiffs' request that it reconsider the March 2023 events in light of a later civil judgment. Plaintiffs plead everything before that window "because [it] establish[es] comparator treatment, Griffin's knowledge and personal role, discriminatory purpose, and the factual context in which the timely police-service decisions occurred" — not as an independent basis for relief.[9]

The January 2025 conduct is Griffin's response to a request for help locating and extraditing Fisher on a felony warrant a Fulton County magistrate issued that month for criminal damage to property arising from the tree-cutting. Griffin told Plaintiffs that coordinating with Florida authorities would be "fruitless at this point," stated that Fisher herself had told an officer she moved to Florida, and then corrected that statement in writing a week later, unprompted, with an apology.[10] The 2026 conduct is MPD's response, through outside counsel, declining to reopen a criminal investigation of Fisher after Plaintiffs asked MPD to reconsider the March 2023 events in light of the December 2025 civil judgment they won against her. Counsel's April 28, 2026, letter, copied to Griffin and Krokoff, called that position "the City of Milton's final position on this issue."[11]

[9] *Id*. at ¶¶ 50, 52.
[10] *Id*. at ¶ 43.
[11] *Id*. at ¶¶ 43, 44, 46-49, 53.

The comparator Plaintiffs rely on for the balance of the case is a single week in February 2024, when Fisher emailed Griffin directly about a claimed threat and Griffin personally researched, responded, and corrected a factual error in her account — while telling Mr. Sriganesha that his own complaint, Case No. 24-00334, was civil, "Unfounded," and would not be assigned a detective.[12] A second officer's review the following month left that classification unchanged.[13]

Plaintiffs plead two counts under 42 U.S.C. § 1983. Count I is an individual-capacity Equal Protection claim against Griffin. Count II is a *Monell* claim against the City, resting on the theory that City Manager Krokoff is the City's final policymaker for how MPD reviews, classifies, and disposes of residents' requests for police services, or, in the alternative, that Griffin himself is the final policymaker for any dispositions the City Manager did not review.[14]

**Standard of Review**

Article III standing is jurisdictional, and a court must resolve it before reaching the merits.[15] Where, as here, a standing challenge is facial rather than factual, the Court accepts the First Amended Complaint's well-pled allegations as

[12] *Id*. at ¶ 59.
[13] *Id*. at ¶¶ 37, 39, 59.
[14] *See id*. at ¶¶ 54-69.
[15] *Steel Co.*, 523 U.S. at 94-95.

true, exactly as it would on a Rule 12(b)(6) motion, and asks whether those allegations establish an injury the federal courts may redress.[16]

The three merits grounds below draw on three further, distinct standards. To survive Rule 12(b)(6), a complaint must plead facts that plausibly show entitlement to relief, not mere conclusions.[17] Qualified immunity is immunity from suit, not merely from liability, and should be resolved at the earliest possible stage.[18] And a municipality cannot be held liable under Section 1983 on a theory of respondeat superior; liability attaches only when a final policymaker's decision is the moving force behind the violation.[19]

One further point bears on how much benefit of the doubt this pleading needs. Pro se complaints are ordinarily construed liberally,[20] but that doctrine exists for unrepresented litigants navigating unfamiliar procedure. This First Amended Complaint is organized around a structured chart of the ordinances Plaintiffs contend control final-policymaker status, a paragraph-by-paragraph timeliness analysis, and a summary table cross-referencing every comparator

---

[16] *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008).

[17] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[18] *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

[19] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-94 (1978); *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

[20] *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

allegation to its supporting paragraphs, and Plaintiffs had counsel as recently as five months before the original Complaint was filed. This is not the case *Haines* was written for.[21]

**Argument and Citation of Authorities**

**1. Plaintiffs still lack Article III standing to challenge how Fisher was prosecuted, and this Court lacks subject-matter jurisdiction over that slice of Count I.**

A private citizen has no judicially cognizable interest in the prosecution or non-prosecution of another person, even when the citizen is the victim.[22] *Linda R.S.* was brought by a mother denied support payments, the direct victim of the underlying non-enforcement, and the Supreme Court still found no standing.[23] Victim status has never mattered to this rule. The Eleventh Circuit applied it six days before this suit was filed. In *Peden v. Stephens*, the plaintiff alleged a county administrator improperly influenced a district attorney's decision not to prosecute the administrator's wife, and recast that as "quite literally, a failure of equal protection under the law."[24] The panel never reached the merits. It held the plaintiff lacked standing, vacated a merits-based summary judgment, and remanded with instructions to dismiss without prejudice.[25]

---

[21] 404 U.S. at 520-21; Doc. 8 at ¶¶ 39, 50, 52, 63-65, 68.
[22] *Leeke v. Timmerman*, 454 U.S. 83, 86-87 (1981); *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *Peden v. Stephens*, __ F.4th __, 2026 WL 2420934 (11th Cir. Aug. 19, 2026).
[23] *Linda R.S.*, 410 U.S. at 619.
[24] *Peden*, 2026 WL 2420934.
[25] *Id*.

Strip the equal-protection label away, and the same claim survives in two places here: Griffin's January 2025 response to Plaintiffs' request that MPD locate and extradite Fisher on her outstanding warrant,[26] and MPD's 2026 decision, through counsel, not to reopen a criminal investigation against Fisher despite the intervening civil judgment.[27] Both are decisions whether to investigate, arrest, extradite, or prosecute one identified person for one identified act. Plaintiffs anticipate this argument, framing "the police services at issue" as "response, investigation, evidence handling, detective assignment, information, and command review," not extradition or prosecution.[28] That framing works for the service disparities Plaintiffs experienced directly, addressed in Ground 2 below. It does not work here: asking whether MPD should have pursued Fisher's warrant more aggressively, or reopened her case after a later civil judgment, is not a claim about services Plaintiffs themselves were denied — it is a claim that Fisher was not pursued as aggressively as Plaintiffs wanted, which *Linda R.S.*, *Leeke*, and *Peden* foreclose regardless of the label.

### 1.1 *Watson v. City of Kansas City* does not save this slice of the claim.

To the extent Plaintiffs invoke the *Watson*/*Navarro* line of cases for the proposition that discriminatory allocation of police protection is actionable, that

---

[26]Doc. 8 at ¶ 43.
[27]*Id*. at ¶¶ 44, 46-49.
[28]*Id*. at ¶ 5.

line does not reach these decisions. *Watson v. City of Kansas City* lets a person sue over protection denied to herself, not over whether the government pursued someone else.[29] And the extradition request is not even the discretionary kind of service *Watson* addresses: Griffin's January 15, 2025, response explained that the warrant's own parameters did not authorize interstate extradition, and that coordinating with Florida authorities would be "fruitless at this point." That limitation comes from the warrant, not from any choice Griffin made about whom to help. There is nothing to allocate unequally when nothing was available to allocate.[30]

The 2026 reopening request fails for a related reason: the decision not to prosecute belongs to the Fulton County District Attorney, an independently elected office with no reporting relationship to Milton, which already reviewed the March 2023 events and declined to prosecute after "a thorough review from both an internal affairs and a criminal investigations perspective."[31] Plaintiffs identify nothing a reopened investigation could turn up that the 2023 review did not already have.[32] A later civil judgment under a preponderance standard says nothing about whether the 2023 declination under a reasonable-doubt standard was correct, and

---

[29] 857 F.2d 690, 692-93 (10th Cir. 1988).
[30] *See id.*; Doc. 8 at ¶ 43.
[31] Doc. 8 at ¶ 29.
[32] *See id.* at ¶ 60.

gives MPD no new basis to reopen what the elected prosecutor already declined to charge.[33]

The Court should dismiss the extradition and reopening slice of Count I, FAC ¶ 43 and FAC ¶¶ 46-49, without prejudice for lack of subject-matter jurisdiction. What remains of Count I is addressed below.[34]

**2. Even on what remains of Count I, Chief Griffin is entitled to qualified immunity.**

Qualified immunity shields Griffin unless Plaintiffs plausibly plead that he, personally, violated a clearly established constitutional right.[35] Plaintiffs cannot clear the second prong, and the first is now a closer question than it was before amendment.

**2.1 Griffin is personally tied to only two of the four timely decisions, and Count I fails as to the other two regardless of qualified immunity.**

Section 1983 does not impose vicarious liability. An individual-capacity defendant answers only for what he personally did or for a decision factually connected to him, not for what a subordinate did on his own watch, and not merely because he holds the title of Chief.[36] That rule decides two of the four timely decisions before qualified immunity is ever reached.

---

[33]Doc. 8 at ¶¶ 28, 46.
[34]*Stalley*, 524 F.3d at 1232.
[35] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Iqbal*, 556 U.S. at 676.
[36]*See Iqbal*, 556 U.S. at 676; *Cottone v. Jenne*, 326 F.3d 1352, 1360-61 (11th Cir. 2003) ("supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability").

FAC ¶ 52 identifies four timely decisions: MPD's October 2024 handling of a threat report responding to Fisher's Nextdoor post, received and closed by Sergeant Pereira;[37] Griffin's own January 2025 letter on interstate extradition;[38] MPD's January 2026 closure of a "Harassing Communications" report;[39] and MPD's 2026 decision, through counsel, not to reopen its investigation of Fisher. FAC ¶ 56 is where Plaintiffs must connect each decision to Griffin. It connects two: the second "personally," the fourth only "on information and belief." For the first and third, ¶ 56 says nothing, no allegation connecting Griffin to Pereira's handling or to whoever closed the January 2026 report.[40]

That absence controls the outcome. The two decisions FAC ¶ 56 does tie to Griffin are precisely what Ground 1 shows Plaintiffs lack standing to challenge. Subtract those two, and the only timely decisions left are the two Plaintiffs never tie to Griffin at all. Ground 2.2 shows the October 2024 incident independently fails because it was never a crime MPD had to enforce; the personal-participation gap disposes of the January 2026 closure on its own. This is a different inquiry from the final-policymaker question Ground 3 addresses for the City — those two decisions were Sergeant Pereira's and an unnamed officer's, not Griffin's.

---

[37] Doc. 8 at ¶¶ 41-42.
[38] *Id*. at ¶ 43.
[39] *Id*. at ¶ 45.
[40] *Id*. at ¶¶ 46-49, 56.

### 2.2 Selective enforcement requires a crime to enforce, and almost everything Plaintiffs complain of was never one.

A selective-enforcement claim requires a similarly situated comparator and an actual enforcement decision to compare it against.[41] Most of what Plaintiffs plead was never a crime MPD had any decision to make about. Fisher pointing a cellphone toward Plaintiffs' children in Plaintiffs' own driveway[42] is not illegal surveillance; Georgia's statute reaches observation in a private place, out of public view, not a driveway visible to anyone passing by.[43] Racist, false statements about a neighbor's ethnicity are not crimes either. Georgia's criminal defamation statute was struck down as unconstitutional.[44] And the October 2024 firearm comments came from unidentified commenters responding to Fisher's post, not from Fisher. MPD's Criminal Investigation Division found no criminal conduct to pursue,[45] and Fisher is not responsible for a stranger's unprompted reaction absent some showing she solicited it, which nothing pled comes close to.

Set those incidents aside and one crime remains in three years of this dispute: the March 2023 tree-cutting. On that incident, the record shows escalation, not indifference. City Manager Krokoff personally analyzed the statutes, sought

[41] *Lewis v. City of Union City*, 918 F.3d 1213, 1224-28 (11th Cir. 2019) (en banc).
[42] Doc. 8 at ¶ 2.
[43] *See, e.g.,* O.C.G.A. § 16-11-62.
[44] *Williamson v. State*, 249 Ga. 851, 295 S.E.2d 305 (1982).
[45] *See* Doc. 8 at ¶¶ 4, 41.

legal review, and arranged a conference with the Fulton County District Attorney's Office, which reviewed both sides' evidence and declined to prosecute. A selective-enforcement claim compares how the government enforces the same law against similarly situated people; here there was one law arguably broken, and the City took it to the elected prosecutor personally. Everything else Plaintiffs call unequal treatment was never a crime MPD had discretion to enforce, because there was nothing to enforce. And the date-of-birth request fails for a related reason: no comparator exists in either direction. Plaintiffs needed Fisher's date of birth to pursue a citizen warrant; Griffin declined, citing the City's potential exposure, and nothing pled alleges MPD ever gave Fisher comparable information about Plaintiffs. A single declined request, with no pled instance of the reverse, is a records-disclosure decision Plaintiffs did not get the answer they wanted from, not disparate treatment.[46]

### 2.3 No clearly established law, from the Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court, gives a complainant the right to compel enforcement against someone else.

"Clearly established" has a specific, limited meaning: the right must come from the United States Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court.[47] No decision from any of the three recognizes what Plaintiffs'

---

[46]Doc. 8 at ¶¶ 23, 26, 29.
[47]*See Terrell v. Smith*, 668 F.3d 1244 (11th Cir. 2012).

theory requires — that because Mr. Sriganesha was arrested and MPD allegedly under-investigated their complaints against Fisher, equal protection required MPD to pursue Fisher to a matching or greater degree. Equal protection restrains what the government does to a person because of race; it does not hand that person a lever over what the government does to a neighbor. That absence of controlling authority alone entitles Griffin to qualified immunity.

Even setting that aside, the closest out-of-circuit cases do not bind this Court and are not on point. *Watson* and *Navarro* are the furthest any circuit has gone toward a differential-police-protection claim, and none of the three features that made them viable is present here.[48] Existing precedent must place the question "beyond debate," settled by controlling authority or a robust consensus of persuasive authority — a general proposition is not enough.[49] A plaintiff "cannot defeat the qualified immunity defense by pointing to general propositions and abstractions;" case law must have developed "in such a concrete and factually defined context" that it gave fair warning, with facts "materially similar" to this case.[50] So even if *Watson* and *Navarro* established that unequal police protection

---

[48] *Watson*, 857 F.2d at 690; *Navarro v. Block*, 72 F.3d 712 (9th Cir. 1995).
[49] *See District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).
[50] *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997); *Lassiter v. Alabama A&M Univ. Bd. of Trustees*, 28 F.3d 1146, 1149-50 (11th Cir. 1994) (en banc).

can violate equal protection, and this Circuit has not adopted that, the facts must be materially similar. On every fact that matters, they are not.

First, neither case is a race case: *Watson* affirmed summary judgment against the sex-discrimination theory and let only a narrower domestic-violence classification claim proceed, and *Navarro*'s surviving claim rested on that same sex-based classification.[51] Neither supplies a framework for a claim of racial discrimination in a neighbor dispute.[52] Second, neither rested on one incident: *Watson*'s plaintiff introduced a department-wide arrest-rate disparity across hundreds of cases, plus the department's own training materials, and *Navarro*'s plaintiffs relied on a 911 dispatcher's sworn admission of a standing practice of not treating domestic-violence calls as emergencies. Both rested on institutional evidence of a general practice; Plaintiffs plead a dispute between two households.[53]

Third, and most fundamentally, both cases involved a completed act of violence the police were supposed to prevent. Nancy Watson was raped, beaten, and stabbed by her husband after police failed to detain him as promised. The Navarro family was murdered by Maria Navarro's estranged husband fifteen minutes after a dispatcher dismissed her specific warning that he was coming to kill her. Plaintiffs allege only an administrative classification and the absence of a

---

[51] *See Watson*, 857 F.2d at 690; *Navarro*, 72 F.3d at 712.
[52] *Id.*
[53] *Watson*, 857 F.2d at 694-96; *Navarro*, 72 F.3d at 714-17.

detective assignment, not a violent crime that MPD's handling of a complaint was supposed to prevent and failed to.[54]

This case does not fit *Watson* or *Navarro* on the law, the evidence, or the injury, and it does not need to, because those decisions do not bind this Court. No case from the Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court gives a complainant the right to compel enforcement, extradition, or disclosure of a third party's personal information. Nor does this case plead any department-wide policy or pattern; it pleads one relationship between two households and asks the Court to treat that relationship's outcome as a constitutional violation. A disagreement with a discretionary law-enforcement call is not an equal protection claim.

### 2.4 The "two complaints" Plaintiffs compare are not the pairing they describe, and on Plaintiffs' own pleading, neither pairing clears clearly established law.

Taking every allegation as true, as the Court must, the First Amended Complaint describes something more complicated than a single side-by-side comparison. Between February 20 and 26, 2024, Fisher emailed Griffin directly about a dismissed stalking charge, a claimed threat, and a police report; Griffin personally researched MPD's records, responded, attached a report, and corrected a factual error in Fisher's account. Plaintiffs plead two separate things of their own

[54] *See Watson*, 857 F.2d at 692-93; *Navarro*, 72 F.3d at 714.

from that same period, not one: a February 12 letter from Mr. Sriganesha to Griffin, the Mayor, and the City Council about the August 2023 arrest, requesting an internal investigation not answered until August 2024, when Griffin reported finding "no evidence of any employee misconduct towards anyone involved;" and Case No. 24-00334, which the paragraphs introducing it tie to a different matter entirely — Fisher's alleged unlawful possession of Plaintiffs' attorney's privileged correspondence. Griffin initially classified that matter civil, "Unfounded," and unassigned; Captain Barstow independently reviewed it the following month, interviewed Plaintiffs' own attorney, and closed it "Unfounded" again "on jurisdictional and legal grounds."[55]

Two things follow, without resolving anything against Plaintiffs. First, nowhere does the FAC allege that Fisher ever asked MPD to investigate an officer's conduct. The internal-investigation request is Sriganesha's alone, and by Plaintiffs' own timeline it was not decided until August 2024, six months after the week Plaintiffs compare it to; a comparator has to exist in the pleading, and none is available for February 2024. Second, what Plaintiffs actually plead as decided that week, Case No. 24-00334, is, on their own description, a report that Fisher improperly had privileged correspondence belonging to Sriganesha, not a request that any officer be investigated. That is a real comparison, and the Court should

[55]Doc. 8 at ¶¶ 36, 37, 39, 40.

take it as true. It still does not help Plaintiffs. No case holds that classifying one complaint as civil rather than criminal, or declining to assign it a detective, while personally researching and responding to a different complaint from a different person, violates a clearly established right. Every case Plaintiffs' theory could reach for involves a flat denial of police protection altogether — *Watson*'s refusal to help a domestic-violence victim, for example — not two independently justified case dispositions adding up to an equal-protection violation.[56] Discretionary, individualized decisions like these are exactly what qualified immunity protects.

Independently, the record does not plausibly show pretext as to Case No. 24-00334. Captain Barstow reviewed it independently the following month, interviewed Plaintiffs' own attorney, and closed it "Unfounded" a second time on stated jurisdictional and legal grounds — after, not before, gathering the facts Plaintiffs say should have changed the outcome. A second officer reaching the same conclusion after actually investigating is not evidence Griffin's classification was pretextual. And even reading the February 12 letter and Case No. 24-00334 as one continuous matter, the result is the same: no case clearly establishes that a classification and assignment decision resolved on stated jurisdictional grounds

[56] *Cf. Lewis*, 918 F.3d at 1224-28 (selective enforcement requires a comparator similarly situated in all material respects).

violates equal protection when weighed against a different complaint from a different person handled the same week.[57]

### 2.5 The extradition and reopening decisions do not independently support liability, even if the Court reaches their merits.

Even if some portion of Griffin's January 2025 and 2026 conduct survived Ground 1's standing argument, no case clearly establishes that accurately describing a warrant's territorial limits, or declining to reopen a matter an elected prosecutor already declined to charge, violates equal protection. Griffin's statements describe the warrant's own parameters, and his unprompted written correction a week later cuts against an inference of concealment.[58] The only charging decision here belongs to the Fulton County District Attorney.[59]

Because Plaintiffs have not plausibly pled that Griffin personally acted with discriminatory purpose as to any decision this Court may reach, and because no clearly established law required him to act otherwise, Chief Griffin is entitled to qualified immunity, and Count I should be dismissed.

## 3. The City cannot be liable under *Monell* on either final-policymaker theory pled in Count II.

A municipality is liable under Section 1983 only when a final policymaker's decision, not merely a subordinate's discretionary act, is the moving force behind a

---

[57] Doc. 8 at ¶ 39.
[58] *Id*. at ¶ 43.
[59] *Id*. at ¶ 29.

constitutional injury; respondeat superior is not enough.[60] Whether an official is a final policymaker for a given function is a question of state and local law, not of who exercises the most practical influence day to day.[61] Plaintiffs plead a single theory, that a final policymaker made or ratified the decisions at issue, in two alternative forms: primarily City Manager Steven Krokoff,[62] and, "to the extent" that theory fails, Chief Griffin himself.[63] Both fail.

### 3.1 The City's own ordinance places final policy-setting authority with the Chief, not the City Manager.

Plaintiffs plead that "final policymaking authority within the City rests with the City Manager, and the City Manager exercised that authority here" for "the City's review, classification, evidence handling, investigative assignment, and final disposition of residents' requests for municipal police services."[64] That conclusion does not survive Plaintiffs' own pleading. The next paragraphs quote Milton Code § 28-20(a), which makes the Chief of Police, "under the city manager's general direction," the official who directs "the administration and operation of all services of the city police department" and "establish[es] the policies, directives, rules and regulations" for it. That specific delegation controls: it assigns policy-setting

---

[60] *Monell*, 436 U.S. at 690-94; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986).
[61] *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126-27 (1988) (plurality op.).
[62] Doc. 8 at ¶ 65.
[63] *Id*. at ¶ 68.
[64] *Id*. at ¶ 65.

authority over exactly the function at issue — how the department reviews, classifies, and disposes of service requests — to the Chief, not the City Manager.[65]

The Charter provisions Plaintiffs cite alongside § 28-20(a) do not displace it. Charter § 3.25 makes the City Manager "the chief administrative officer" who "direct[s] and supervise[s] the administration of all departments;" Charter § 4.10(d) makes each department director, including the Chief, "subject to the direction and supervision of the city manager" in operations[66] — general oversight of a subordinate department. A specific ordinance delegating authority over a particular function to one official controls over a separate, general grant of supervisory authority to someone above him in the chain of command,[67] and Milton's code identifies no board empowered to reverse the Chief's classification of a service request, the way the Eleventh Circuit requires before treating a decision as reviewable rather than final. Krokoff's conduct does not change this: reviewing a subordinate's decision, receiving complaints, calling a dispute "blame-shifting," and telling Griffin to "do our best to defuse it" are the ordinary acts of a city manager staying informed, not an exercise of final policy-setting authority.[68] Nothing pled shows Krokoff personally directed a disposition of the Sriganeshas'

---

[65] *Id.* at ¶ 63.
[66] *Id.* at ¶ 63.
[67] *Praprotnik*, 485 U.S. at 126-27.
[68] *See, e.g., Quinn v. Monroe County*, 330 F.3d 1320, 1325-26 (11th Cir. 2003); *Scala v. City of Winter Park*, 116 F.3d 1396, 1399-1402 (11th Cir. 1997); Doc. 8 at ¶¶ 66-67.

complaints, as opposed to receiving information about dispositions others made under delegated authority — a legal question the Court can resolve now on the pleadings, since it turns on the code and charter Plaintiffs themselves attach.

### 3.2 Griffin's individual dispositions were casework, not policy, and do not support the fallback theory either.

Plaintiffs' fallback theory asks the Court to treat Griffin's own dispositions as the City's final policy "to the extent" they "fell within the Chief of Police's authority under Milton Code § 28-20(a), were not reviewed or altered by the City Manager, and were not subject to further municipal administrative review."[69] Even crediting that Griffin holds final authority over police administration in the abstract, *Pembaur* draws a line this theory does not cross: a final decisionmaker's routine, individualized application of existing policy to a particular case is not itself a new policy, even when nobody above him happens to overrule that particular call.[70]

The decisions Plaintiffs identify, Griffin's August 2024 conclusion that MPD's internal review found "no evidence of any employee misconduct," and his 2025-2026 handling of the extradition request and reopening decision, are exactly that kind of casework. The one item that reads differently is Griffin's January 2025 explanation of how MPD applies extradition and NCIC parameters to out-of-state

[69]Doc. 8 at ¶ 68.
[70]475 U.S. at 480-83, n.12.

warrants generally — closer to an institutional statement than a one-off case call. But that is precisely the conduct Ground 1 shows Plaintiffs lack standing to challenge: a claim about whether Fisher was pursued aggressively enough, not about a service Plaintiffs were denied. A statement Plaintiffs have no standing to challenge cannot also serve as the policy act that makes Griffin the City's final policymaker for a different claim.[71]

Because neither final-policymaker theory Plaintiffs plead states a claim against the City, Count II should be dismissed.

**4. Plaintiffs plead no pre-2024 claim to toll, and O.C.G.A. § 9-3-99 could revive only a tree-cutting claim that fails anyway.**

Georgia's two-year limitations period governs Section 1983 claims, and federal law governs accrual.[72] Because Plaintiffs sued on August 25, 2026, anything before August 25, 2024, is untimely unless something tolls it.

Plaintiffs plead the pre-2024 conduct two ways: as background and comparator evidence, and, in the alternative, as independently timely under O.C.G.A. § 9-3-99.[73] Rule 8 permits that,[74] but neither version helps them.

The first problem is that there is no pre-2024 claim to toll. Counts I and II seek relief for the four timely decisions listed in FAC ¶ 52, not for anything that

---

[71] Doc. 8 at ¶¶ 40, 43, 47-49.
[72] *See Wallace v. Kato*, 549 U.S. 384, 388 (2007); *Owens v. Okure*, 488 U.S. 235, 249-50 (1989); *see also Wilson v. Cromer*, 356 Ga. App. 763, 847 S.E.2d 213 (2020).
[73] Doc. 8 at ¶¶ 52-53.
[74] Fed. R. Civ. P. 8(d)(2)-(3).

came before them.[75] Tolling stops a limitations clock; it does not create a claim where none has been pled.

The second problem is that, even if FAC ¶ 53 could be read to plead a pre-2024 claim, the statute does not reach it. Section 9-3-99 tolls only a tort claim "which arises out of the facts and circumstances relating to the commission of such alleged crime."[76] The Court of Appeals has extended the statute to defendants other than the perpetrator, but only for claims that arise out of the crime itself.[77] Plaintiffs allege one crime: Fisher's March 2023 criminal damage to property. Mr. Sriganesha's August 2023 arrest and MPD's handling of the later complaints between the two households did not arise out of that tree-cutting. They grew out of separate police decisions on separate matters, and § 9-3-99 does not reach them.

That leaves only the City's handling of the tree-cutting itself, and that claim fails on the merits. City Manager Krokoff personally analyzed the statutes, sought legal review, and took the matter to the Fulton County District Attorney's Office, which reviewed both sides' evidence and declined to prosecute.[78] Tolling a claim that fails on its merits saves nothing.

[75]Doc. 8 at ¶¶ 52, 54-69.
[76]O.C.G.A. § 9-3-99.
[77]*See Harrison v. McAfee*, 338 Ga. App. 393, 788 S.E.2d 872 (2016).
[78]Doc. 8 at ¶¶ 20, 26, 29; *see supra* Ground 2.2.

Nor does a continuing-violation theory help. Each police decision Plaintiffs plead is a discrete act with its own limitations clock, and a discrete act does not become timely because a later, similar act is.[79] Each pre-2024 decision was known and actionable when it happened, which is exactly why Plaintiffs plead it only as background.

**Conclusion**

For these reasons, Defendants ask the Court to dismiss the First Amended Complaint. The extradition and reopening slice of Count I, FAC ¶¶ 43 and 46-49, should be dismissed without prejudice under Rule 12(b)(1) for lack of subject-matter jurisdiction. The balance of Count I should be dismissed under Rule 12(b)(6) because Griffin is entitled to qualified immunity. Count II should be dismissed under Rule 12(b)(6) because neither final-policymaker theory Plaintiffs plead states a claim against the City. And the pre-2024 conduct Plaintiffs plead should be treated as background and comparator evidence only, not an independent, separately timely basis for relief.

Respectfully submitted,
/s/ J. Scott Key
J. Scott Key
Ga. Bar No. 416839
*Attorney for Defendants*

J. Scott Key, LLC
199 West Jefferson Street
Madison, GA 30650
(678) 610-6624
scott@scottkeylaw.com

[79] *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-14 (2002).

**Certificate of Compliance**

I certify that this brief has been prepared in Times New Roman, 14-point font, one of the font and point selections approved by the Court in Local Rule 5.1(B), and that it is double-spaced as required by Local Rule 5.1(C)(2).

/s/ J. Scott Key
J. Scott Key
Ga. Bar No. 416839
*Attorney for Defendants*

J. Scott Key, LLC
199 West Jefferson Street
Madison, GA 30650
(678) 610-6624
scott@scottkeylaw.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| Sellathurai ("Ganesh") Sriganesha and Sangeetha Sriganesha,<br><br>Plaintiffs,<br><br>v.<br><br>City of Milton, Georgia; and Jason Griffin, in his individual capacity,<br><br>Defendants. | Case No.:<br>1:26-cv-4820-SEG |

**Certificate of Service**

I certify that I have served an accurate and true copy of the foregoing Brief in Support of Defendants' Renewed Motion to Dismiss First Amended Complaint via U.S. Mail upon:

Sellathurai Sriganesha
Sangeetha Sriganesha
315 Eagles Pass
Milton, Georgia 30004

This the 28th day of September, 2026.

Respectfully submitted,
/s/ J. Scott Key
J. Scott Key
Ga. Bar No. 416839
*Attorney for Defendants*

J. Scott Key, LLC
199 West Jefferson Street
Madison, GA 30650
(678) 610-6624
scott@scottkeylaw.com