**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**SELLATHURAI ("GANESH") SRIGANESHA and SANGEETHA SRIGANESHA,**

**Plaintiffs,**

**vs.**

**CITY OF MILTON, GEORGIA; and JASON GRIFFIN, in his individual capacity,**

**Defendants.**

**CIVIL ACTION FILE NO.:**

**1:26-CV-04820-SEG**

**JURY TRIAL DEMANDED**

EXHIBIT A

PROPOSED SECOND AMENDED COMPLAINT

**JURY TRIAL DEMANDE**
**D**

Plaintiffs Sellathurai ("Ganesh") Sriganesha and Sangeetha Sriganesha, by counsel, allege as follows:

## I. NATURE OF THE ACTION

1. This action concerns the unequal administration of municipal police services to two neighboring households in Milton, Georgia. Plaintiffs are a family of Sri Lankan origin. Their then-neighbor, Paula Fisher, is white. Plaintiffs allege that the City of Milton and Police Chief Jason Griffin treated their requests for police

assistance, investigation, evidence handling, and command review differently because of Plaintiffs' race and national origin.

2. The challenged services include protective patrols, receipt and handling of evidence, responses to requests for source information, and command-level review. Earlier incidents supply background and comparator evidence; the timely acts and the responsibility attributed to each Defendant are separately identified below.

3. Plaintiffs seek relief for the unequal treatment they personally experienced. They do not ask this Court to order anyone's arrest, prosecution, extradition, or investigation, and do not seek relief based on whether Fisher or another person is charged.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4) because the claims arise under the Fourteenth Amendment and 42 U.S.C. § 1983.

5. Venue is proper under 28 U.S.C. § 1391(b) because Defendants reside in this District and the events giving rise to the claims occurred in Milton, Fulton County, Georgia.

## III. PARTIES

6. Plaintiffs are married United States citizens of Sri Lankan national origin. They own and reside at 315 Eagles Pass, Milton, Georgia, with their two

minor children. Fisher described Ganesh as being on a work visa and having recently become a citizen. MPD records also identified Ganesh as "INDIAN" or "INDIAN MALE."

7. Defendant City of Milton, Georgia (the "City") is a municipal corporation that operates the Milton Police Department ("MPD").

8. Defendant Jason Griffin was an MPD Captain and Uniform Patrol Commander in March 2023 and became Chief of Police in December 2023. He is sued in his individual capacity for his own actions under color of state law.

## IV. FACTUAL ALLEGATIONS

### A. The March 2023 tree incident and initial police response

9. Fisher then owned the adjoining property at 305 Eagles Pass. On March 10, 2023, she contacted Officer Zachary O'Neill about planned tree work and a possible civil standby. During the call, she described Plaintiffs as Indian and referred to their heavy accent. She also asserted that she had a survey, HOA approval, and advice from a City arborist. O'Neill's advice about proceeding was conditioned on the work being on her property. Separately, an Internal Affairs memorandum records Fisher's statement that Ganesh was on a work visa and had recently obtained citizenship. Plaintiffs also identify a later body-camera encounter with Officer Ma during which Fisher described them as noncitizens on work visas who did not own

their home. The latter statements are pleaded from Plaintiffs' account of the recording, not as verbatim quotations from the memorandum.

10. Plaintiffs had not authorized cutting on their property and received no advance notice of the March 15 work. Fisher had discussed with O'Neill attendance if trouble arose and assistance with moving vehicles. Police attended after Sangeetha called 911 during the cutting. Plaintiffs do not allege that a separate scheduled standby assignment for Fisher has been identified. In a separate call attributed to O'Neill, Ganesh requested an officer remain throughout Plaintiffs' survey. O'Neill conveyed a supervisor's manpower explanation for declining to remain for the entire survey and said police would respond to an active confrontation. Plaintiffs compare those services while acknowledging that the duration and circumstances of the requests differed.

11. On March 15, 2023, five Nellie Stevens holly trees were cut down and a sixth was severely cut or damaged on Plaintiffs' property. Ganesh personally saw Fisher, Dennis Guaracino, and another individual participating in the work. He repeatedly stated that the trees belonged to Plaintiffs, that they had not authorized removal, and that the cutting must stop. The work continued despite those objections. Sangeetha called 911. Plaintiffs also report damage to Ganesh's truck and the children's basketball-backstop netting during the operation. O'Neill and Sergeant Chad West attended and treated ownership and vehicle damage as civil

issues based on their understanding of Fisher's survey. According to Plaintiffs' account of the body-camera recording, O'Neill described Plaintiffs as calm, told Fisher her statements were not helping, and sought to defuse Fisher's statement that Plaintiffs' fence was "next." West warned Plaintiffs that criminal conduct could lead to jail. Plaintiffs recall no comparable jail warning to Fisher in the exchange they witnessed. West also stated that he had conveyed expectations to Fisher; Plaintiffs do not claim knowledge of every separate conversation between police and Fisher.

12. Near the end of the episode, Fisher said, according to Plaintiffs' recording account, "I cut these down, so I don't have to hear your mouth anymore." Ganesh also personally heard her say she was new to the United States, that she could not call 911, and that she was removing their fence. Plaintiffs supplied recordings and reported those statements to MPD. O'Neill's recorded response to a separate immigration reference was that police did not handle immigration; Plaintiffs do not attribute Fisher's private statements to police as their own words.

13. The boundary-survey work occurred in stages after the March 15 cutting. Ganesh recalls that surveyors arrived on March 16, 2023, marked the shared boundary with stakes and pink ribbons, and returned on March 18 to complete fieldwork on the remaining sides. Roheen Paul's boundary retracement plat was finalized March 21. These dates concern the same survey, not three separate surveys. Plaintiffs rely on the survey for the stump locations within their property; they do

not attribute an exact five-foot or greater setback measurement to Paul without a supporting measurement. Between March 18 and March 23, Plaintiffs identified the trees their survey placed on their side, offered recordings, and requested protection against further incursions. MPD maintained that ownership was disputed and the matter civil. Plaintiffs disputed that premise and requested command review.

14. On March 28, 2023, Griffin personally declined a requested meeting as fruitless, described his research and civil-dispute conclusion, and stated that MPD could enforce an order after a Fulton County judge signed it. Plaintiffs renewed their request and attended the May 23 meeting with Griffin and other City personnel. The subsequent civil judgment and MPD's 2026 responses are described below. Plaintiffs do not construe Griffin's statement as a promise that any civil judgment would compel criminal investigation or prosecution.

15. Ganesh personally delivered a copy of the March 21 survey to MPD's front desk on March 24, 2023, asking that it be attached to the police case. Plaintiffs also supplied the survey through email and, in May, communications to City leadership by email and certified mail. They brought another copy to the May 23 meeting with Austin, Griffin, and other City and police representatives and discussed the boundary and tree locations. Delivery is not alleged to establish that every addressee personally read the survey. Plaintiffs also delivered a thumb drive containing audio and video evidence of the March 15 events. Lieutenant Andrew

Noblett acknowledged receipt and said he would share it with detectives. On April 12, Ganesh reported that survey stakes had been removed. According to Ganesh's account of the call, Officer Sarah Moore-Whittington characterized the dispute over the stakes' placement and legitimacy as civil and directed him to pursue the matter through Fulton County courts rather than dispatching an officer at that time. Plaintiffs do not allege that West expressly authorized removal of the stakes.

16. On June 9, 2023, Lieutenant Scott Lappin wrote internally that many calls existed only as CAD notes, that the only detective follow-up he recalled concerned Fisher's complaints against Ganesh, and that he did not know what file would be provided to the District Attorney. The City later stated that no chain-of-custody record existed because Plaintiffs' thumb drive was not received or maintained as criminal-investigation evidence. Information from the drive was retained electronically. Plaintiffs do not equate the absence of a custody form with destruction of recordings or proof that prosecutors never received them.

**B. Griffin's notice and prior handling of the households' requests**

17. At a May 23, 2023 meeting attended by Griffin, Plaintiffs described Fisher's race-, accent-, and immigration-related statements and explained that they believed those statements affected MPD's treatment of them. Plaintiffs also told Griffin that Fisher had said they did not own their home and were not allowed to call 911. Ganesh alleges that Griffin knew Fisher had made statements about Plaintiffs'

national origin, citizenship, immigration status, and home ownership. Plaintiffs identify body-camera footage documenting statements Fisher made to officers; they do not allege that Griffin personally viewed that footage.

18. At the May 23, 2023 meeting, Austin indicated MPD would provide Fisher's date of birth for the citizen-warrant process. Immediately afterward, Griffin told Plaintiffs MPD would not provide it because Fisher could sue the City. On May 25, Plaintiffs memorialized that explanation to City Manager Steven Krokoff, who replied that it was helpful to his analysis. During that same week, Lieutenant Christopher Bradshaw conferred with Griffin about Plaintiffs' court activity, checked the court docket, and reported information about Plaintiffs' filings to Fisher.

19. On May 24, Griffin emailed that he had consulted the court and cited privacy restrictions as the reason MPD would not provide Fisher's date of birth. On June 30, Austin separately cited information-release restrictions. In June, Krokoff also analyzed whether the tree incident supported criminal-trespass or criminal-damage charges, sought legal review, and proposed presenting the evidence to the District Attorney's Office; he stated that, if the District Attorney found a prosecutable case, he would ask Austin to direct investigators to seek a warrant. The City later reported that the District Attorney declined prosecution. Plaintiffs allege these events as context for the City's review process and the explanations given, not as a separate claim that a particular prosecution was required.

20. On August 20, 2023, Officer Sarah Moore-Whittington investigated Fisher's complaint concerning a phone near an upstairs window of Plaintiffs' home, sought a warrant, and arrested Ganesh. Ganesh states that the phone was not functioning and was not recording; those assertions are not presented as independently established police findings. During the encounter, Plaintiffs told Sergeant Little and Moore-Whittington that they had reported Fisher recording them and their minor children and offered available security footage. According to Ganesh, Little said they were not interested in prior reports, and the officers declined to examine that footage or take the requested report during that encounter. Plaintiffs do not allege that the offered footage necessarily negated the warrant's grounds. The prosecution was later dismissed following the statutory speedy-trial process; that disposition is not pleaded as a probable-cause adjudication. No separate false-arrest or jail-injury count is asserted.

21. On August 31, 2023, Sangeetha reported Fisher pointing a phone toward her and the children in the driveway. Plaintiffs identify Moore-Whittington as responding. Their prior account describes older recordings and police contact Fisher, followed by an Unfounded disposition. Plaintiffs do not allege that footage or independent witnesses corroborating that morning's event have been established. Fisher's earlier allegations concerned recording into her home and identified videos and a contractor witness; Plaintiffs acknowledge those differences.

22. In December 2023, Plaintiffs reported escalating camera surveillance, threats, and safety concerns. MPD classified the matter as "Unfounded" and a "courtesy report," with no detective assignment.

23. On February 20–21, 2024, Fisher asked Griffin for police records and information concerning Ganesh's January 17, 2024, report for use in her protective-order proceeding. Griffin personally provided the report, explained that it was classified as Unfounded and had not been assigned to a detective, and reviewed and corrected Fisher's assertion that a police report accused Ganesh of threatening her with a gun. On February 26, Griffin forwarded another communication from Fisher to Sergeant Lappin. Plaintiffs compare Griffin's research, explanation, provision of records, and follow-up with his later handling of Ganesh's requests for the source of information Griffin had given him. They acknowledge that Fisher sought an existing report while Ganesh sought the underlying source of information; the requests were not identical.

24. On May 23, 2024, Fisher alleged that Ganesh used a false identity in police calls. Griffin personally searched the telephone number in idiCore, reported a return for someone other than Ganesh, and directed Dula to follow up. On May 28 he told Fisher that his preliminary search yielded the opposite result to her accusation and that Dula would follow up. Ganesh further alleges that Griffin researched and provided information to Fisher, including assistance locating contact information,

while declining Ganesh's requests for information and assistance. Plaintiffs rely on Griffin's personal research and routing assistance while acknowledging that his result did not substantiate Fisher's accusation and that the requests described in paragraphs 23–24 and 34–36 were not identical.

25. On March 4, 2024, Griffin told Krokoff that a meeting was being arranged and designated Barstow as the point of contact for Ganesh's matters. On March 5, Griffin told Plaintiffs he had asked Barstow, the CID commander, to meet and address their concerns. A meeting and review of the separate mail complaint followed. On August 6, Griffin responded to Plaintiffs' express racial-discrimination complaint that MPD found no employee misconduct and offered review of a specific complaint to determine whether further investigation was warranted. Plaintiffs acknowledge these responses and meetings rather than allege that no review ever occurred. His August 6 response is background preceding the two-year period before suit.

26. On August 22, 2023, after Ganesh's release on bail, Sergeant Kevin Barry circulated Fisher's fear of retaliation to police under the subject POAP 305 Eagles Pass. Barry asked police to cruise by when possible, stating that there had been no threats or evidence so far but that Fisher was worried about retaliation. Plaintiffs compare this protective-patrol assistance with their October 2024 request following the gun-related comments and publication of their address. Barry and Pereira were

different decision-makers; the allegation concerns a patrol direction, not proof of the number of patrols actually performed.

**C. October 2024 safety reports and the City's response**

27. Around midnight October 15 into October 16, 2024, Plaintiffs learned of Fisher's Nextdoor accusations concerning Ganesh and their sons. The captured discussion included Christopher Wigley's proposed gun cleaning on a tailgate, Craig Rethwilm's shooting comment, and Ken Marshall's publication of Plaintiffs' address and suggestion of gathering outside with guns. Those comments are attributed to the identified commenters, not all to Fisher. Ganesh authored an anonymous October 13 Facebook post about the neighboring property. Sangeetha later posted a court order defensively, as described in Ganesh's October 22 email. Plaintiffs do not allege verified privacy settings or a precise date for that separate court-order post from the supplied captures alone.

28. On October 20 and 21, 2024, Ganesh emailed Krokoff, Deputy City Manager Inglis, and Mayor Jamison, copying Sangeetha, about Case 24-01768 and the household's safety. He requested review of the posts and gun/address material, assistance preventing escalation, protective patrols, and review of the difficulty receiving police attention. Griffin was absent from the displayed original recipient fields and first appears copied on Krokoff's October 22 reply. Plaintiffs do not allege that Griffin directed the earlier police handling on that basis.

29. Plaintiffs identify October 20–21, 2024 as the dates of their calls and contact with Sergeant Pereira about the posts and family safety; both spouses were present for relevant interactions. Ganesh recalls that Pereira asked him to email the posts and promised to call after reviewing them. After several hours without a response, Pereira called around 8 a.m. the next morning. Ganesh recalls Pereira saying he had been busy with traffic-related matters, had reviewed the screenshots, and found no criminality. Ganesh earlier recalled a closure-related call in the evening; Plaintiffs do not assign a verified time to that conversation. Pereira told Ganesh the matter had been closed as Unfounded and said, in substance, that anyone could say, "I would come and shoot your ass," and that a statement like that was not a crime. Ganesh disagreed because the posts included references to firearms and shooting and disclosed the family's address. Ganesh also recalls an indication that CID would review the matter. After Pereira requested complete posts, Plaintiffs asked him to collect them because they were afraid to leave home; they handed him printed copies during his visit. The formal disposition, closure timestamp, and entering official have not been independently verified. No CID detective later contacted Plaintiffs about Case 24-01768. Plaintiffs requested protective attention but did not observe a patrol; that observation does not establish that no patrol occurred.

30. On October 22, 2024, Krokoff acknowledged distress, described blame-shifting, referred to Fisher moving away, encouraged disengagement, and said the response was not an invitation for further engagement. He encouraged reports of criminal activity to police. His response supplied no patrol plan, named follow-up official, or promised command review of the evidence-intake concerns. At 10:48 p.m., Ganesh replied on behalf of both Plaintiffs, copying Inglis, Mayor Jamison, Griffin, Ward, and Sangeetha. Sangeetha personally joined in, authorized, reviewed, and signed the requests for protection and reconsideration. The reply asked Krokoff to reconsider the blame-shifting characterization, review the posts and comments already given to Pereira, and identify protective steps. No City official later contacted Sangeetha about those requests. Neither Plaintiff received a response to the reconsideration request. Plaintiffs allege Krokoff's own response and the unanswered request, not that he authored Pereira's earlier disposition.

31. Plaintiffs allege that the administrative response left their particular requests for evidence-intake review and protective attention unaddressed. They contrast it with MPD's circulation of Fisher's protective-patrol request despite the absence of documented threats in Barry's email. They do not allege a corresponding materially identical request answered differently by Krokoff himself, and Ganesh knows of no comparable request by Fisher that Krokoff handled more favorably. Their fear began before Krokoff's reply; the injury they attribute to the allegedly

unequal response is denial of equal access to protective and review services and resulting prolongation of distress, not creation of the original online threat or all earlier harm.

**D. January 2026 report**

32. On January 1, 2026, at approximately 12:38 a.m., Sangeetha received abusive Messenger messages from the account displayed as Rupert Rotti, including national-origin and deportation language, references to the household and children, and watch language. Plaintiffs do not know the operator and have no evidence identifying Fisher or her agent as the sender. Ganesh reported the messages to Senior Officer Michael Piurkoski under Case 26-00002 and Report 20260000172. His 8:09 a.m. written follow-up recounted an initial documentation-only assessment and requested inclusion of screenshots and context, reasons for the response, preservation of account information, identification of the sender, and supervisory or CID review. At 8:56 a.m., Piurkoski wrote that the report was filed as Harassing Communications and would be sent to CID for review and follow-up. Ganesh's 9:08 a.m. reply requested confirmation and a follow-up contact.

33. Piurkoski forwarded the exchanges to supervisor Laura Hamby, and Ganesh separately spoke with Hamby by telephone. Ganesh asked for the next steps and the case number. He recalls that Hamby provided the number, said the report would be provided to CID, and said someone would contact them. No one followed

up, and no later CID result or substantive answer to the follow-up questions was communicated to Plaintiffs. They do not allege an established CID closure or that Griffin decided this report; Ganesh did not speak with Griffin about it. Piurkoski requested Ganesh's driver's-license number and date of birth, which Ganesh declined while supplying his name and address. Although Ganesh recalls no similar request in the Fisher encounter he identifies as Incident 2300665, he does not know MPD's general intake practice; the identification request is not pleaded as an independently established discriminatory policy.

**E. Griffin's January and October 2025 information responses**

34. Griffin's personal information responses in January 2025. On January 14, 2025, Ganesh emailed Griffin and Barstow, copying Sangeetha, about the reported Fisher warrant and her relocation. His requests included execution and location efforts and a question about the source of MPD's information that she had moved. On January 15, Griffin stated that Fisher personally told an MPD officer she moved to Florida. He also explained the stated Georgia-only warrant parameters, referred Ganesh to the Marshal's Office, and said MPD would detain Fisher if encountered locally with an active warrant.

35. On January 22, after Ganesh requested details of that supposed conversation, Griffin withdrew the account. He stated that no such statement was made by Fisher, apologized for his assumption, and described an indirect account

supplied by an unidentified officer from another agency concerning a business and billing dispute. Ganesh requested the agency and officer's identity at 10:31 a.m. He checked his email, text messages, and voicemail and confirms that no response identifying the agency or officer arrived through those channels. Plaintiffs acknowledge Griffin's correction and apology and do not allege he knew the identifiers or knowingly lied. The separate information-service allegation concerns how he answered and researched the source question, not a claimed entitlement to extradition or execution of the warrant.

36. Griffin's October 2025 records response. Ganesh continued seeking the source information and records supporting City characterizations of the dispute. On October 20, Clerk Tammy Lowit stated that no additional responsive records existed, apart from records expressly withheld as privileged. After Ganesh again identified missing source particulars and reported a new request, Lowit forwarded his message to Griffin. Griffin replied that MPD had nothing to assist with the new request and that her earlier answer was accurate. This is pleaded as Griffin's personal endorsement of that records answer, not proof that he searched, knew the officer's identity, possessed unproduced records, concealed evidence, or decided any criminal complaint. Ganesh compares this response with Griffin's personal provision of Fisher's report, explanation of its status, correction of her report-related assertion, and follow-up described in paragraph 23. Fisher sought an existing police report,

while Ganesh sought the source of information Griffin himself had communicated. The requests were not identical, and Plaintiffs do not allege that the requested source identifiers necessarily existed in a producible record. The comparison concerns the extent of Griffin's explanation, records assistance, and follow-up. The May 2024 telephone-number search involved a different kind of request and supplies background only.

**F. Civil judgment and 2026 correspondence**

37. The judgment and renewed 2026 review request. On December 29, 2025, the State Court of Fulton County entered a civil default judgment against Fisher, Guaracino, and Emergency Tree USA, LLC. On March 16, 2026, former counsel Joseph C. Peake wrote directly to Griffin seeking CID review, participant-specific evaluation, a written explanation of any refusal and evidence still needed, and preservation. The packet included the judgment, photographs, and an authenticated survey, and offered original videos upon request. The civil judgment is not pleaded as establishing criminal liability or discrimination by these Defendants.

38. On March 30, Ken Jarrard, stating that his office represented MPD, acknowledged the materials and explained that a civil default judgment did not establish the basis for criminal enforcement. He communicated MPD's refusal to open a criminal investigation or pursue charges. Plaintiffs' April 2 response requested the factual and legal basis, the evidence supporting earlier ownership

statements, and what additional evidence was needed. On April 17, Jarrard responded for MPD that the surveys conflicted, the matter was a private boundary dispute, and the tree-service participants appeared to have relied reasonably on survey information without criminal intent. Plaintiffs disputed those premises and requested the specific supporting survey evidence and reconciliation with earlier police statements.

39. On April 17, 2026, at approximately 11:07 a.m. Eastern time, Griffin forwarded Ganesh's 10:51 a.m. rebuttal email and its listed reply-letter attachment to Christopher Ward. The visible forward adds no substantive instruction. On April 28, Jarrard stated that his April 17 letter constituted the City's final position and listed Griffin and Krokoff as copied. The forward establishes Griffin's routing act, not his authorship or approval of the refusals or a direction to Ward to reject the request. Plaintiffs do not identify the internal decisionmaker through copied-recipient status alone.

40. On October 15, 2026, surveyor Roheen Paul supplied a written clarification disputing a material survey conflict and confirming the stump locations under his original survey. Plaintiffs rely on this as later clarification, not proof that City officials possessed the later letter when making earlier decisions. Ganesh has not confirmed when, if ever, that October clarification was transmitted to City officials. Plaintiffs distinguish it from the original March 2023 survey supplied

through the channels described in paragraph 15. Ganesh further alleges that, after the City received a judge-signed order, the appellate court's affirmance of that order, and Plaintiffs' survey evidence, the City continued through its attorney to maintain that the property dispute involved conflicting surveys. Plaintiffs allege the continued position as part of the City's later handling of their requests for review and explanation. They do not allege that the order or survey compelled a criminal investigation or prosecution, or that the correspondence identifies which municipal official made the later decision. The 2026 correspondence is alleged as history and context; Plaintiffs do not seek relief for nonprosecution itself.

**G. The comparison and the basis for the claims**

41. The service comparisons concern protective-patrol directions, evidence intake, police-records assistance, source explanations, and review of handling. Barry circulated Fisher's patrol request without documented threats; Plaintiffs requested protective attention after supplying gun/address material. Griffin personally provided Fisher a report, explained its status, corrected a report-related assertion, researched an identity allegation, helped Fisher locate contact information, and routed a further communication; Ganesh's January 2025 source-identification follow-up went unanswered, and Griffin later endorsed the limited records answer. Fisher requested an existing report while Ganesh sought an information source; Barry and Pereira were different decisionmakers. Plaintiffs acknowledge those

differences. The May 2024 telephone-number search, survey, and recording episodes provide background rather than allegations of identical requests, evidence, offenses, or legal grounds.

42. Plaintiffs infer discriminatory treatment from the identified service differences, Fisher's race-, accent-, and immigration-related statements communicated to police and known to Griffin, the specific discrimination complaints brought to command staff, and the subsequent handling described above. Ganesh identifies no express statement by Griffin that his January or October 2025 responses were based on race or national origin. The claimed discriminatory purpose is an inference, not an admitted fact. Plaintiffs do not allege that Fisher's bias automatically establishes an official's purpose, that notice alone proves discrimination, or that an absent production item proves concealment or personal participation. Griffin's correction and apology, meetings, responses, contrary database result, and supervisor referrals are acknowledged.

43. Plaintiffs filed this action on August 25, 2026. The October 2024 service requests, January and October 2025 information responses, and prefiling 2026 events occurred within two years before filing. Griffin's August 6, 2024 response and earlier episodes precede that period and are alleged as background and comparator evidence, not independently timely claims. A later similar event is not

alleged automatically to revive an earlier discrete act. The October 15, 2026 survey clarification is identified separately as postfiling history.

## V. COUNT I — EQUAL PROTECTION — GANESH SRIGANESHA

### 42 U.S.C. § 1983 — Jason Griffin, Individual Capacity

44. Ganesh realleges paragraphs 4 through 43 to the extent they concern Griffin's personal acts and Ganesh's own injury.

45. Griffin acted under color of state law. Ganesh alleges that Griffin intentionally administered the identified information services differently because of Ganesh's race or national origin, denying Ganesh equal governmental treatment. Ganesh actions infer discriminatory intent.

46. Ganesh's individual-capacity claim concerns Griffin's own administration of the January 2025 source-information requests and October 20, 2025, records response. Ganesh alleges that Griffin researched and supplied information and assistance to Fisher, including assistance locating contact information, while providing less research, explanation, and follow-up in response to Ganesh's requests for information. He relies on the examples described in paragraphs 23–24 and 34–36, while acknowledging that the requests were not identical and that Fisher's request for an existing report differed from his request for the source of Griffin's information. Ganesh alleges that the differential assistance, considered with Griffin's knowledge of the family's discrimination complaints and

Fisher's statements about their national origin, citizenship, immigration status, and home ownership, supports an inference of intentional race- or national-origin-based treatment. The claim does not rest on the corrected mistake alone or assert a general constitutional right to a complete or error-free response. Ganesh does not seek damages based on whether a third party was located, arrested, extradited, or prosecuted.

47. Griffin's 2023 and early 2024 personal information handling and the particular source-search assistance to Fisher are alleged as context and evidence of intent. Griffin's August 6, 2024 response is likewise background, not an independently timely deprivation. Plaintiffs do not allege he directed the October 2024 report handling or the January 2026 report, and do not treat his April 17 forwarding act as a substantive denial. This count is asserted by Ganesh for his own information-service treatment; Sangeetha's receipt of copied messages alone is not pleaded as an individual deprivation by Griffin.

48. Ganesh alleges that Griffin's intentionally discriminatory administration of the identified information services denied him equal governmental treatment. After the January 2025 exchange, the unanswered source-identification request caused uncertainty, frustration, emotional strain, and a feeling of powerlessness to obtain a reliable explanation. The October 2025 response added continuing uncertainty and emotional exhaustion associated with repeated attempts

to obtain answers. Ganesh acknowledges Griffin's correction and apology and does not claim that a mistake or an unsatisfied request alone establishes a constitutional violation. He seeks damages only for harm attributable to actionable personal acts, and punitive damages only upon the required showing of intentional violation or reckless or callous indifference to federally protected rights.

## VI. COUNT II — MUNICIPAL LIABILITY

### 42 U.S.C. § 1983 — City of Milton, Georgia

49. Plaintiffs reallege paragraphs 4 through 43.

50. The City is liable under 42 U.S.C. § 1983 for its own policies, decisions, and actions that caused the unequal administration of police services. Plaintiffs do not seek to impose liability on the City solely because it employed Griffin or other MPD personnel.

51. The City operates under a council-manager structure. Charter § 3.25 identifies the Manager as chief administrative officer, responsible to Council, and assigns direction and supervision of departments except as otherwise provided. Charter § 4.10(d) subjects department directors to the Manager's direction and supervision. Code § 28-20(a) assigns the Chief direction of police administration and operations and establishment of departmental policies under the Manager's general direction. Section 28-21 assigns preparation of operational procedures to the Chief. Plaintiffs identify these provisions as the asserted allocation of relevant

functions, not as an allegation that title or general supervision alone makes every case decision municipal policy.

52. Charter § 3.28 generally channels Council dealings with supervised employees through the Manager but expressly excepts inquiries and investigations under § 3.12. The Charter also grants inquiry and supervisory responsibilities to the Mayor and Council. Plaintiffs' unanswered escalations do not by themselves establish that legal review was unavailable or that Krokoff's authority was unreviewable.

53. Krokoff personally received the October 20 and 21 requests for protective attention and review of the police response, authored the October 22 administrative reply, and received the unanswered reconsideration request described above. Both Plaintiffs challenge that response as an alleged unequal administration of their own requests, distinct from the earlier police disposition. They do not allege Krokoff caused the original threats or that his reply caused distress already experienced before it. Krokoff was the final decision maker.

54. Plaintiffs allege that Krokoff's deliberate choice concerning the administrative review and protective-service escalation, made in the City Manager function assigned by the identified provisions, constituted the City's own policy decision for that function. The asserted injury is the allegedly discriminatory denial of that service and resulting prolongation of distress. Plaintiffs do not rely solely on

his supervisory status, silence of Council, or failure to reverse an officer. They do not allege he directed the report closure or that notice of their discrimination allegation by itself establishes discriminatory approval.

55. Plaintiffs allege the unequal protective-service and administrative-review response was a moving force behind their denial of equal treatment and associated injuries. They rely on the specific requests, comparison, decisions, and asserted function-specific authority above, not vicarious liability for every MPD interaction. The January 2026 episode and March–April 2026 correspondence, including the City's later position after receiving judicial and survey materials, provide context. Plaintiffs do not allege those later communications alone establish final policymaking authority or an independent municipal-policy violation.

## VII. DAMAGES

56. Plaintiffs seek compensation for their own distress, humiliation, fear, loss of security at home, and other injury caused by the constitutional violations alleged in these counts. Their fear and reputational harm from the online posts began before the October 22, 2024 response. Ganesh attributes additional humiliation, helplessness, and prolonged distress to the characterization of their concerns and the unanswered protective-service and review request. Sangeetha's fear for her children and family also predated Krokoff's response. She reports that afterward she felt ignored, abandoned, humiliated, and betrayed by the City, and less confident that it

would take her safety concerns seriously. She describes sleepless nights, monitoring the home, contacting the children's school, and informing the principal and other members of the Hopewell Middle School Governance Council; she offered to resign but ultimately continued serving. Sangeetha reports attending two counseling sessions, but the available information does not allocate those sessions or their cost to a particular event. Ganesh identifies counseling in or around October 2024, January 2025, and October 2025; the available information does not allocate sessions or expense by challenged act. Ganesh also reports paying less than $100 for an open-records request made after the challenged information-service treatment, but the present information does not identify the exact amount, request, or causal connection to an actionable deprivation. Any such expense is sought only to the extent proven causally attributable. Ganesh's employment loss preceded the October 2024 and 2025 acts and is not attributed to them. His August 2023 detention-related head injury and treatment are not alleged to have been caused by these later responses. Plaintiffs do not attribute a particular physical condition or all prior litigation expenses to these counts without supporting causal facts.

57. Plaintiffs seek nominal damages for each completed constitutional violation and punitive damages against Griffin as permitted by law. Plaintiffs do not seek punitive damages against the City.

## VIII. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court:

(a) enter judgment for Ganesh against Griffin on Count I and for Plaintiffs against the City on Count II;

(b) award compensatory damages in an amount determined by the jury;

(c) award nominal damages;

(d) award punitive damages against Griffin in an amount determined by the jury;

(e) award costs and, to the extent available, attorney's fees under 42 U.S.C. § 1988;

(f) award pre- and post-judgment interest as permitted by law; and

(g) grant such other relief as is just and proper.

## IX. JURY DEMAND

58. Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted, this 23rd, day of November, 2026

FULLER SLOAN, LLC

**By: /s/ Stephen P. Fuller**
**Stephen P. Fuller**
Ga. Bar No. 280336

**6455 East Johns Crossing**
Suite 400
Johns Creek, Georgia 30097
(770) 622-4700
spf@fslaw.law